[No. E010679. Fourth Dist., Div. Two. Feb. 10, 1994.]

RUTH IRWIN et al., Plaintiffs and Appellants, v.
CITY OF HEMET et al., Defendants and Respondents.

[No. E010851. Fourth Dist., Div. Two. Feb. 10, 1994.]

RUTH IRWIN et al., Plaintiffs and Respondents, v.
CITY OF HEMET et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A and B.

508

512

**COUNSEL**

Manes & Watson and William H. Steiner for Plaintiffs and Appellants and for Plaintiffs and Respondents.

MacLachlan, Burford & Arias and Christopher D. Lockwood for Defendants and Respondents and for Defendants and Appellants.

## OPINION

McKINSTER, J.—In an action for damages for wrongful death and deprivation of civil rights, the plaintiffs appeal from a summary judgment entered in favor of the defendants. The defendants appeal from the denial of their postjudgment motion for attorney fees. We reverse the judgment and dismiss the appeal from the postjudgment order.

### FACTUAL AND PROCEDURAL BACKGROUND

At approximately 5 p.m. on May 3, 1989, Officers Cain and Quinn of the Police Department of the City of Hemet were dispatched in response to a report of a man drunk in public. They located the subject of the report, Steven Irwin (Irwin), who was obviously intoxicated. They also determined that there was an outstanding traffic warrant for his arrest. The officers arrested him both on the charge of being drunk in public and on the outstanding warrant. Quinn then transported Irwin to the Hemet jail while Cain returned to patrol.

Quinn booked Irwin into the jail at approximately 5:20 p.m. and then went back to patrol. Initially Irwin was placed in a cell with Mr. John Diaz. However, because Irwin was continually yelling, he was moved into an empty cell by Watch Commander Montoya and Officer Whitener. Montoya made "full cell checks" at 5:40 p.m. and 6:03 p.m., and several "visual checks" thereafter. At approximately 6:40 p.m., when Whitener could not see Irwin when making a visual check through the cell door window, he opened the cell door and found Irwin hanging in the cell by a mattress cover around his neck. The officers cut him down, administered cardiopulmonary resuscitation, and called paramedics. However, Irwin never regained consciousness.

Within a year of Irwin's death, a complaint was filed on behalf of four plaintiffs: Irwin's two parents and his two surviving minor children.[1] Named as defendants are the City of Hemet, Watch Commander Montoya, and Officers Cain, Quinn, and Whitener. The complaint is alleged in three counts: the first, for damages pursuant to 42 United States Code section 1983 (section 1983); the second, for damages for the "deprivation of federal constitutional rights"; and the third, for damages for wrongful death.

The defendants moved for summary judgment on May 30, 1991. At an initial hearing in July of 1991, the trial court granted summary adjudication

---

[1] The complaint alleges that the plaintiffs are not only the heirs and survivors of Irwin but also his "representatives . . . ." Nevertheless, the balance of the complaint makes it clear that they are suing solely in their individual capacities, and not on behalf of the decedent's estate.

in favor of all defendants on the wrongful death count and on a prayer for punitive damages. As to the remaining issues, the hearing was continued to permit further discovery. (Code Civ. Proc., § 437c, subd. (h).) At the subsequent hearing in December of 1991, the motion was granted, and judgment was entered in favor of the defendants.

After the entry of judgment, the defendants moved for an award of attorney fees. The trial court denied the motion in part and took the remaining aspect under submission. While the record does not reflect any ruling, the defendants contend that the submitted portion of the motion was also denied.

The plaintiffs appeal from the summary judgment against them and the defendants appeal from the alleged denial of their postjudgment motion. We consolidated the two appeals.

In the unpublished portion of this opinion, we reject the defendants' contentions that federal procedural law governs the motion for summary judgment as to the federal civil rights claim, and that they had established that Irwin's parents had no standing to bring the wrongful death claim. We publish the remaining portion to give the trial courts guidance concerning the standards to be applied to section 1983 claims based upon jail suicides. In it, we conclude that the motion was properly granted on that claim as to the individual defendants but not as to the City of Hemet, and thus reverse the judgment.

DISCUSSION

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . .

C. *The Federal Civil Rights Claim*

■ Both the first and second counts seek to recover damages for the alleged deprivation of the plaintiffs' rights as secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. Although stated separately, the two counts differ only in that the first count is expressly brought pursuant to section 1983, while the second makes no reference to that section. However, section 1983 does not create any substantive rights. Instead, it serves only to provide a remedial cause of action in the event any substantive federal rights are violated. (*Chapman* v. *Houston*

---

*See footnote, *ante*, page 507.

*Welfare Rights Org.* (1979) 441 U.S. 600, 617-618 [60 L.Ed.2d 508, 522-523, 99 S.Ct. 1905].) Accordingly, the second count is entirely redundant to the first, and need not be considered separately.

Section 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ The "two essential elements" to a claim under section 1983 are "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." (*Parratt* v. *Taylor* (1981) 451 U.S. 527, 535 [68 L.Ed.2d 420, 429, 101 S.Ct. 1908, 1913].) Here, there is no question that the defendants were acting under color of state law when they took and retained custody of Irwin. Our inquiry, therefore, focuses on the second element.

### 1. *What Rights Are the Defendants Alleged to Have Violated?*

As noted in the unpublished portion of this opinion, the first step in a summary judgment analysis is to examine the pleadings. Have the plaintiffs alleged that the defendants deprived them of a federal right?

■ The plaintiffs allege that they have been permanently "deprived of the love, affection, society, companionship, support and pecuniary benefits of decedent, and of their familial relationship with him," in violation of the "rights, privileges and immunities guaranteed by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution . . . ." However, such conclusions are insufficient unless they are supported by factual allegations.

There is nothing in the complaint to support the contention that either Irwin or the plaintiffs were deprived of any rights secured by the Fourth Amendment.[5] The plaintiffs admit that, at the time of his arrest, Irwin was drunk in public and was the subject of one or more outstanding arrest

---

[5] That amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

warrants. Thus, there is no doubt that the defendants had probable cause to arrest him.[6] Moreover, there are no allegations concerning any arrest or other seizure involving any of the plaintiffs. Therefore, the complaint fails to state a claim for the deprivation of anyone's Fourth Amendment rights.

■ Similarly, the plaintiffs fail to allege any facts to support their conclusion that they were denied rights protected by the Eighth Amendment. They apparently contend that the defendants' failure to prevent Irwin from taking his own life constitutes "cruel and unusual punishment" proscribed by that amendment.[7] However, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." (*Ingraham* v. *Wright* (1977) 430 U.S. 651, 671, fn. 40 [51 L.Ed.2d 711, 730, 97 S.Ct. 1401, 1412]; *Bell* v. *Wolfish* (1979) 441 U.S. 520, 535, fn. 16 [60 L.Ed.2d 447, 466, 99 S.Ct. 1861]; *City of Revere* v. *Massachusetts General Hosp.* (1983) 463 U.S. 239, 244 [77 L.Ed.2d 605, 611, 103 S.Ct. 2979, 2983].) Since there is no allegation that anyone had been found guilty of anything at the time that Irwin committed suicide, the plaintiffs' claim that they have been deprived of their Eighth Amendment rights must fail.

■ Thus, of the three constitutional provisions invoked in the complaint, only the Fourteenth Amendment has any possible application to the facts alleged. Are the interests which the plaintiffs allege to have been infringed— "the love, affection, society, companionship, support and pecuniary benefits of decedent [toward the plaintiffs], and . . . their familial relationship with him"—among those interests in "life, liberty or property" which are protected by the Fourteenth Amendment?

The United States Supreme Court has repeatedly held that a natural parent has a protectible liberty interest "in the companionship, care, custody, and management of his or her children . . . ." (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 559, 92 S.Ct. 1208, 1212]; *Lassiter* v. *Department of Soc. Serv. of Durham Cty.* (1981) 452 U.S. 18, 27 [68 L.Ed.2d

---

[6]Even if Irwin had been improperly arrested, his survivors cannot maintain actions in their individual capacities under section 1983 to collect damages for the infringement of Irwin's Fourth Amendment rights, because those rights are personal rights which may not be vicariously asserted. (*Smith* v. *City of Fontana* (9th Cir. 1987) 818 F.2d 1411, 1417.)

[7]The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

640, 649-650, 101 S.Ct. 2153, 2159-2160]; *Santosky* v. *Kramer* (1982) 455 U.S. 745, 758-759 [71 L.Ed.2d 599, 609-610, 102 S.Ct. 1388, 1397].) While the high court has never, to our knowledge, expressly held that the surviving parents and children of a person killed by someone acting under color of state law may sue on their own behalf to collect damages for the loss of their rights to the society and companionship of the decedent, the United States Courts of Appeals have: *Smith* v. *City of Fontana, supra,* 818 F.2d at pp. 1417-1419 (children); *Trujillo* v. *Bd. of Cty. Com'rs of Cty. of Santa Fe* (10th Cir. 1985) 768 F.2d 1186, 1189 (parent & sibling); *Kelson* v. *City of Springfield* (9th Cir. 1985) 767 F.2d 651, 653-655 (parents); *Bell* v. *City of Milwaukee* (7th Cir. 1984) 746 F.2d 1205, 1242-1245 (parents); but see *Valdivieso Ortiz* v. *Burgos* (1st Cir. 1986) 807 F.2d 6, 7-9 (questioning existence of cause of action).

In summary, both the parents and the minor children of Irwin have alleged that the actions and omissions of the defendants have deprived them of their interest in the familial society and companionship of their decedent as guaranteed to them by the due process clause of the Fourteenth Amendment.

> 2. *The Individual Defendants Have Established That They Did Not Deprive the Plaintiffs of Their Rights.*

As the second step of the summary judgment analysis, we now turn to the defendants' moving papers, to see if the defendants have established either that a necessary element of such a claim does not exist or that they have a complete defense.

The individual defendants contend that the alleged deprivation of the plaintiffs' familial rights did not occur, because the defendants lacked the culpable mental state necessary to constitute such a deprivation. However, the precise mental state necessary to support either section 1983 claims in general, or claims for the deprivation of the interest in a familial relationship with a child or parent in particular, is not settled.

In *Monroe* v. *Pape* (1961) 365 U.S. 167 [5 L.Ed.2d 492, 81 S.Ct. 473], the court held that a specific intent to deprive a person of a federal right is not required in actions under section 1983 (formerly 42 U.S.C. § 1979). (365 U.S. at p. 187 [5 L.Ed.2d at p. 505, 81 S.Ct. at p. 484], overruled on another ground in *Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 663 [56 L.Ed.2d 611, 619, 98 S.Ct. 2018, 2022].) Instead, section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." (*Monroe* at p. 187 [5 L.Ed.2d at p. 505].)

Twenty years later, the Supreme Court reiterated that section 1983 does not "contain a state-of-mind requirement." (*Parratt* v. *Taylor, supra,* 451 U.S. 527, 534 [68 L.Ed.2d 420, 428, 101 S.Ct. 1908, 1912], fn. omitted.) It "affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind." (*Id.,* at p. 535 [68 L.Ed.2d at p. 428, 101 S.Ct. at p. 1913].) Accordingly, the court held that a loss of a prisoner's personal property, "even though negligently caused, amounted to a deprivation" of a property interest protected under the Fourteenth Amendment. (*Id.,* at pp. 536-537 [68 L.Ed.2d at p. 429, 101 S.Ct. at p. 1913], fn. omitted.)

However, the high court retreated from that position in *Daniels* v. *Williams* (1986) 474 U.S. 327 [88 L.Ed.2d 662, 106 S.Ct. 662]. ■ Section 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right. . . . But in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right," a particular mental state may be required to establish a deprivation of that right. (474 U.S. at pp. 329-330 [88 L.Ed.2d at pp. 666-667, 106 S.Ct. at p. 664].) Thus, in considering any claim under section 1983, ". . . a court must examine closely the nature of the constitutional right asserted to determine whether a deprivation of that right requires any particular state of mind." (*Trujillo* v. *Bd. of Cty. Com'rs of Cty. of Santa Fe, supra,* 768 F.2d at p. 1189.)

■ The particular constitutional right asserted here is the liberty interest in the continuation of the companionship and society between a parent and a child, which is protected by the due process clause of the Fourteenth Amendment. What degree of mental culpability, if any, is required to deprive a person of that liberty interest?

■ The right to due process under the Fourteenth Amendment is one of those rights of which a person is deprived only when the defendant acts with a particular state of mind. "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." (*Daniels* v. *Williams, supra,* 474 U.S. at p. 331 [88 L.Ed.2d at p. 668, 106 S.Ct. at p. 665].) While mere negligence may result in actual loss or injury, it is not a deprivation in the constitutional sense. (*Id.,* at p. 330 [88 L.Ed.2d at p. 667, 106 S.Ct. at p. 664].) Therefore, ". . . the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." (*Id.,* at p. 328 [88 L.Ed.2d at p. 666, 106 S.Ct. at p. 663], overruling *Parratt* v. *Taylor, supra,* 451 U.S. 527 [68 L.Ed.2d 420, 101 S.Ct. 1908].) ■ However, the court expressly left open the possibility that a mental

state more culpable than ordinary negligence, but "less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." (*Daniels, supra,* at p. 334, fn. 3 [88 L.Ed.2d at p. 670].) Therefore, the state of mind required to deprive someone of a due process right to familial society and companionship is, at minimum, something more culpable than mere negligence.

■ When a prisoner claims that his conditions of confinement—e.g., food, clothing, medical care, cell temperature, or protection against other inmates—are so inadequate that they amount to cruel and unusual punishment under the Eighth Amendment, "deliberate indifference" is the minimum mental state required to constitute a deprivation of rights. (*Wilson* v. *Seiter* (1991) 501 U.S. 294, 301-302 [115 L.Ed.2d 271, 281, 111 S.Ct. 2321, 2326-2327].) The same test applies to claims by pretrial detainees, who are protected from punishment by the Fourteenth Amendment. (*Redman* v. *County of San Diego* (9th Cir. 1991) 942 F.2d 1435, 1442-1443; cf. *Bell* v. *Wolfish, supra,* 441 U.S. at p. 545 [60 L.Ed.2d at p. 472] [". . . pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."].) ■ The deliberate indifference standard also applies to the act or omission which caused the loss of the plaintiffs' society and companionship with Irwin: the failure of those having custody of a pretrial detainee to prevent a suicide by the person in custody. (*Bowen* v. *City of Manchester* (1st Cir. 1992) 966 F.2d 13, 16, and the cases cited therein, such as *Elliott* v. *Cheshire County, N.H.* (1st Cir. 1991) 940 F.2d 7, 10; 1 Schwartz & Kirklin, Section 1983 Litigation: Claims, Defenses, & Fees (2d ed., 1993 supp.) pp. 271-274.)

However, the plaintiffs are not suing to recover compensation for the deprivation of any of Irwin's rights. Instead, they allege that their own individual rights were violated. When a defendant proximately causes the death of a person while acting with a sufficiently culpable mental state to constitute a deprivation of that person's right to personal security, is any additional mental state necessary to constitute a deprivation of the rights of the decedent's surviving parents and children?

The federal courts which have addressed this issue are not in agreement.[8] (See *Rucker* v. *Harford County, MD.* (4th Cir. 1991) 946 F.2d 278, 282 [describing split of authority]; 1 Schwartz & Kirklin, Section 1983 Litigation: Claims, Defenses, & Fees (2d ed. 1991) Survivorship §§ 13.5 & 13.7,

---

[8]On a federal question, the decisions of the United States Supreme Court are binding on state courts. However, the decisions of the lower federal courts, while persuasive, are not binding on us. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) Thus, in the absence of a controlling United States Supreme Court opinion, we make an

pp. 731-737 & 739-740; *id.* (2d ed., 1993 supp.) pp. 271-274.) The 10th Circuit has held that an "intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." (*Trujillo* v. *Bd. of Cty. Com'rs of Cty. of Santa Fe, supra,* 768 F.2d at p. 1190.) There, the mother and the sister of a decedent alleged that the defendant intended to deprive the decedent of his rights, but the 10th Circuit held that ". . . this intent may not be transferred to establish intent to deprive his mother and sister of their constitutionally protected rights. The alleged conduct by the State, however improper or unconstitutional with respect to the son, will work an unconstitutional deprivation of the freedom of intimate association only if the conduct was directed at that right. Because the [plaintiffs] did not allege such intent, their complaint was properly dismissed for failure to state a constitutional claim." (*Ibid.*)

By similar reasoning, the First Circuit has come to the same result, at least when the child is no longer a minor: "[T]he Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with a child. The Court has never held that governmental action that affects the parental relationship only incidentally . . . is susceptible to challenge for a violation of due process. . . . [¶] We decline . . . to make the leap ourselves from the realm of governmental action directly aimed at the relationship between a parent and a young child to an incidental deprivation of the relationship between [a stepfather and siblings] and their adult relative." (*Valdivieso Ortiz* v. *Burgos, supra,* 807 F.2d at pp. 8-9; accord, *Cortes-Quinones* v. *Jimenez-Nettleship* (1st Cir. 1988) 842 F.2d 556, 563 [natural mother of adult decedent].)

The Eighth Circuit has adopted the analysis of *Valdivieso Ortiz* v. *Burgos, supra,* 842 F.2d 556, concluding: "Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct." (*Harpole* v. *Arkansas Dept. of Human Services* (8th Cir. 1987) 820 F.2d 923, 928 [denying recovery to grandmother of minor decedent].)

On the other hand, many cases discuss the right of survivors of a decedent to recover damages in vindication of their individual rights without mentioning any mental state other than that necessary to constitute the deprivation of the decedent's rights. (See, e.g., *Bell* v. *City of Milwaukee, supra,* 746 F.2d 1205; *Kelson* v. *City of Springfield, supra,* 767 F.2d 651.) Even after *Trujillo*

---

independent determination of federal law. Where the federal circuits are in conflict, the decisions of the Ninth Circuit are entitled to no greater weight than those of other circuits. (*Elliot* v. *Albright* (1989) 209 Cal.App.3d 1028, 1034 [257 Cal Rptr. 762]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 779-780, pp. 750-751.)

in 1985 and *Valdivieso Ortiz* in 1986, some courts fail to address the issue of whether the existence of a deprivation of the survivors' rights depends upon the defendants' actions having been directed at the familial relationship, and thus suggest that there is no separate intent required. (E.g., *Elliott* v. *Cheshire County, N.H.*, *supra*, 940 F.2d 7.)

Some other courts have specifically addressed the issue and have expressly rejected any such intent requirement. Most notably is the Ninth Circuit, which explained its disagreement with *Trujillo* as follows: "*Trujillo* imposed this requirement of specific intent on a claim of interference with the familial relationship in order to avoid throwing open the judicial floodgates to claims based on merely negligent acts. *Id.* [768 F.2d 1190] Now that *Daniels* [v. *Williams*, *supra*, 474 U.S. 327 (88 L.Ed.2d 662, 106 S.Ct. 662)] has closed this potential floodgate by requiring the act causing the deprivation to have been more than simply negligent, . . . *Trujillo*'s additional focus on the state actor's motivation is no longer necessary to serve its purpose. . . . As long as the state official's *action* which deprived the plaintiffs of their liberty was more than merely negligent, the plaintiffs can state a section 1983 claim without further alleging that the official was trying to break up their family." (*Smith* v. *City of Fontana*, *supra*, 818 F.2d at p. 1420, fn. 12.)

*Greene* v. *City of New York* (S.D.N.Y. 1987) 675 F.Supp. 110 recites the same reasons for rejecting the rule of *Trujillo*, and also relies upon "the legislative history of the Ku Klux Klan Act of 1871, the precursor of § 1983. In a description of the Act, Representative Butler stated: 'This then is what we offer to the people of the United States as a remedy for wrongs, arsons and murders done. This is what we offer to a man whose house has been burned, as a remedy; to the woman whose husband has been murdered, as a remedy; *to the children whose father has been killed*, as a remedy.' Cong.Globe, 42d Cong., 1st Sess. 807 (1871) (italics added). This specific language clearly supports plaintiffs' position." (675 F.Supp. at p. 114.)

The *Greene* court noted that to require, ". . . in addition to the intent to shoot with reckless disregard as to the consequences, a specific awareness on the defendant's part that [the person the defendant was attempting to shoot] had children who would be deprived of his companionship if he were killed would effectively nullify the right [to companionship and society of a family member] altogether . . . ." (675 F.Supp. at p. 115.) Commentators in this field have made the same observation: "The extreme unlikelihood that any surviving relative will be able to make such a showing [of intent to interfere with the family relationship] renders the wrongful death remedy recognized in *Trujillo* virtually meaningless to § 1983 claimants." (1 Schwartz & Kirklin, *supra*, Survivorship, § 13.5, p. 736, fn. omitted.) Similarly, *Trujillo*'s

state of mind requirement was rejected as "idealistic and unworkable" in *de la Cruz LaChapel* v. *Chevere Ortiz* (D. Puerto Rico 1986) 637 F.Supp. 43, 46.

For all of these reasons, we believe that *Smith* v. *City of Fontana, supra*, 818 F.2d 1411 represents the better rule, and thus decline to require any showing that the state actor specifically intended to disrupt the decedent's family relationships. If the defendants acted with deliberate indifference to the consequences of their action, they are liable for the consequences of those actions both to Irwin and to Irwin's parents and children.

 If deliberate indifference in the defendants' actions toward Irwin which results in his death is a sufficient mental state to deprive the plaintiffs of their constitutional rights to society and companionship, what is "deliberate indifference?" The federal circuit courts have split regarding the quantum of knowledge which a jailer must have in order to satisfy the deliberate indifference standard. (See description in *Young* v. *Quinlan* (3d Cir. 1992) 960 F.2d 351, 360.) However, the better analysis in the context of jail suicides appears to us to consist of three elements.

The first element concerns the degree of the risk of harm inherent in the detainee's condition: the detainee must have had a particular vulnerability to or tendency toward suicide which created a strong likelihood, rather than a mere possibility, that self-inflicted harm would occur. (*Colburn* v. *Upper Darby Tp.* (3d Cir. 1991) 946 F.2d 1017, 1023-1024.)

Second, the custodial officials either knew or should have known of that vulnerability and the risk of self-inflicted harm it created. (946 F.2d at pp. 1023-1024; *Berry* v. *City of Muskogee* (10th Cir. 1990) 900 F.2d 1489, 1498.) Custodians may be found to "know" of a particular vulnerability to suicide when they have had actual knowledge either of a prior attempt to commit suicide, of an apparently serious threat to commit suicide, or of a psychiatric diagnosis identifying suicidal propensities. (*Colburn* v. *Upper Darby Tp., supra*, 946 F.2d at p. 1025, fn. 1; *Elliott* v. *Cheshire County, N.H., supra*, 940 F.2d at p. 11.)

Because mere negligence will not support a Fourteenth Amendment claim, "should have known" in this context "is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. The 'strong likelihood' of suicide must be 'so obvious that a lay person would easily

recognize the necessity for' preventative action, [citation]; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." (*Colburn* v. *Upper Darby Tp.*, *supra*, 946 F.2d at p. 1025.)

■ In short, either the custodians must have had actual knowledge of the strong likelihood of self-inflicted harm, or the "objective evidence" (*Buffington* v. *Baltimore County, MD.* (4th Cir. 1990) 913 F.2d 113, 120) of that risk must be "so substantial or pervasive that knowledge can be inferred . . . ." (*Berry* v. *City of Muskogee*, *supra*, 900 F.2d at p. 1498; accord, *Cortes-Quinones* v. *Jimenez-Nettleship*, *supra*, 842 F.2d at p. 558.)

Third, despite such knowledge of the risk of harm to the detainee, the custodians failed to take reasonable measures to attempt to prevent that harm from occurring. (*Berry* v. *City of Muskogee*, 900 F.2d at p. 1498; *Elliott* v. *Cheshire County, N.H.*, *supra*, 940 F.2d at pp. 11-12).)

■ Since "[t]he key to deliberate indifference in a prison suicide case is whether the defendants knew, or . . . should have known, of the detainee's suicidal tendencies" (*Elliott* v. *Cheshire County, N.H.*, *supra*, 940 F.2d at pp. 10-11), the knowledge element was the only one of the three requirements attacked by the defendants in their motion for summary judgment. In that regard, they submitted declarations from everyone involved in either the arrest or the custody of Irwin. Each of them declared in substantially identical language: "At no time did I observe any conduct or hear any words of Mr. Irwin that gave me any reason to believe that he was likely to commit suicide." They acknowledge, however, that Irwin was obviously intoxicated at the time of his arrest and that he repeatedly yelled and made a great deal of noise while he was in custody. Reasonably interpreted, those declarations establish that the defendants had no actual knowledge that Irwin was likely to kill himself, and that there were no statements or conduct from which they should have known of that likelihood.

In response, the plaintiffs cite to evidence that: Irwin had yelled for help, claiming that his hand was bleeding, when in fact his hand was not injured; Irwin had yelled for half an hour before being moved to another cell; Irwin yelled in an angry tone of voice; Irwin banged on the bars and made a disturbance, "kept complaining about being arrested and appeared very upset," and "kept saying 'I'm losing it' and was yelling for help." Declarations from two expert correctional consultants state that Irwin's conduct indicated suicidal tendencies, that those warning signs should have been apparent to the defendants or would have been had they been properly trained, and that the risk of suicide was "substantial" or "high."

The plaintiffs' rebuttal evidence fails to create a triable issue of fact regarding the existence of the requisite mental state. *Freedman* v. *City of Allentown, PA.* (3d Cir. 1988) 853 F.2d 1111, is instructive. There, the decedent had prominent scars on his wrists and inside his elbows and neck, which were readily apparent to the defendants, and which a forensic pathologist identified as "'suicide hesitation cuts.'" (*Id.*, at p. 1116.) The court held that, even assuming that a "reasonably competent prison official" should have recognized those scars as indications of prior suicide attempts, "the failure to recognize them as such, without more, amounts only to negligence . . . ." (*Ibid.*)

Similarly, assuming that a reasonably competent jailer should have recognized Irwin's behavior as indicating a high risk of suicidal tendencies, that would at most show that the jailer was negligent. It does not tend to establish the test relevant here, which is whether the likelihood of suicide was "'so obvious that a lay person would easily recognize the necessity for' preventative action . . . ." (*Colburn* v. *Upper Darby Tp., supra,* 946 F.2d at p. 1025.)

Thus, the individual defendants having established that they neither knew nor should have known that Irwin was likely to kill himself, and the plaintiffs having failed to rebut that evidence, the motion for summary judgment was properly granted in favor of the individual defendants on the section 1983 claim.

### 3. *The City of Hemet Has Not Established That It Did Not Deprive the Plaintiffs of Their Rights.*

Municipalities are among those persons to whom section 1983 applies. (*Monell* v. *New York City Dept. of Social Services, supra,* 436 U.S. at p. 690 [56 L.Ed.2d at p. 635, 98 S.Ct. at p. 2035].) However, section 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." (436 U.S. at p. 692 [56 L.Ed.2d at p. 636, 98 S.Ct. at p. 2036].) Thus, a local government is not liable under section 1983 "for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." (436 U.S. at p. 694 [56 L.Ed.2d at p. 638, 98 S.Ct. at pp. 2037-2038].) In short, ". . . a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." (*Canton* v. *Harris* (1989) 489 U.S. 378, 385 [103 L.Ed.2d 412, 425, 109 S.Ct. 1197, 1203].)

Thus, any liability of the City of Hemet must be based upon its own tortious actions or omissions, not those of its employees. Moreover, the question of whether a city is liable under section 1983 for a " 'failure to train' " claim "does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation." (*Canton* v. *Harris, supra,* 489 U.S. at p. 388, fn. 8 [103 L.Ed.2d at p. 426, 109 S.Ct. at p. 1204].) For both of these reasons, the fact that the motion for summary judgment was properly granted as to the individual defendants does not resolve the potential liability of the City of Hemet.

The plaintiffs' complaint alleges that, despite the suicide of another inmate in the city's jail in 1985, the city had adopted a policy or custom of neglecting the persons in its custody by, inter alia, failing to adequately train its jailers in suicide prevention and in the screening of inmates for suicidal propensities.

"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." (*Canton* v. *Harris, supra,* 489 U.S. at p. 389 [103 L.Ed.2d at p. 427, 109 S. Ct. at p. 1205].) "The issue in a case like this one . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.' " (*Id.,* at p. 390 [103 L.Ed.2d at p. 427, 109 S.Ct. at p. 1205].) Furthermore, the inadequacy in the city's training program must be closely related to the "ultimate injury," such that the injury would have been avoided had the employee been trained under a program that was not deficient in the identified respect. (*Id.,* at p. 391 [103 L.Ed.2d 428, 109 S. Ct. at p. 1206].)

Hemet's summary judgment motion did not attempt to establish as a matter of undisputed fact that any of these elements were missing.[9] Instead, Hemet contended that it did not need to address those issues because the

---

[9]The defendants' statement of undisputed facts identifies the precise issues to which their motion is directed: (1) whether Irwin was murdered; (2) whether the defendants had reason to believe that Irwin would commit suicide; (3) whether the individual defendants are entitled to qualified immunity; (4) whether Irwin's parents have standing to bring a wrongful death action; and (5) whether Irwin's children had filed the requisite governmental tort claim. All of the evidence cited there is directed toward those issues.

Nowhere in their separate statement did the defendants seek to establish that the city's training program was adequate, that any inadequacy was not the result of a city policy, or that any inadequacy did not cause the death of Irwin. While the defendants do ultimately discuss these issues in a supplemental reply memorandum, they erroneously assume that the burden is on the plaintiffs to establish those facts. While that may be true at trial, it was not true under the summary judgment law applicable at the time this motion was made.

complaint fails to adequately allege that any deficiency in the city's training program proximately caused Irwin's suicide.

The city is mistaken. The complaint alleges that, "[b]y reason of the aforedescribed acts and omission[s] of defendants, plaintiffs have been . . . deprived of the love, affection, society, [and] companionship . . . of decedent, and of their familial relationship with him . . . ." The city's alleged adoption of a policy or custom not to train its jailers in suicide screening and prevention is one of those "aforedescribed" acts. Thus, the plaintiffs adequately alleged that the constitutional deprivation of which they complain was caused by the city's policy or custom.

Accordingly, the summary judgment in favor of the city cannot be upheld on this ground. Since that is the only ground properly advanced in the defendants' motion to establish the city's alleged lack of liability, the summary judgment as to it must be reversed.

## DISPOSITION

In summary, the motion for summary judgment should have been denied as to all defendants on the wrongful death claim, and should have been denied as to the City of Hemet on the section 1983 claim. While the motion was properly granted as to the individual defendants on the section 1983 claim, the one-final-judgment rule precludes the entry of any judgment until all claims against those defendants have been resolved. Accordingly, the judgment is reversed in its entirety.

The judgment having been reversed, the appeal from the ruling on the postjudgment motion for attorney fees is dismissed as moot.

All parties shall bear their own costs on appeal.

Dabney, Acting P. J., and McDaniel, J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.