[No. B091484. Second Dist., Div. Six. July 9, 1996.]

LINDA LUCAS et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

278

## COUNSEL

Klass, Helman & Ross, Edward M. Fox and Devonne L. Daley for Plaintiffs and Appellants.

Thomas & Price, Craig Donahue and Linda B. Hurevitz for Defendants and Respondents.

## OPINION

**STONE (S. J.), P. J.**—Linda Lucas[1] appeals from a judgment in favor of respondent County of Los Angeles (County), Deputy Alexander Radovic, Deputy Randolph Goff, Deputy Stephen Landers, Lieutenant Robert Neil Sedita, Sergeant Warren Wright, and Does 1 through 50. She contends that the trial court's judgment is procedurally improper and that the trial court erred in holding that the federal court's conclusions of law were fatal to appellant's state court claims. We determine that the trial court's procedure, though irregular, was not improper. We determine further that the trial court erred in ruling that the federal court's finding of qualified immunity in the civil rights action was res judicata on the issue of immunity in Government Code section 845.6 in the state court action. We reverse the judgment.

---

[1]Cindy West, as administrator of the Estate of Jeffrey W. Lucas, and the Estate of Jeffrey W. Lucas, also purport to appeal from the judgment. The trial court dismissed these parties for failure to follow requirements for presenting a claim against a governmental entity or to petition to file a late claim. There is no challenge on appeal to that order. Consequently, we dismiss Cindy West, as administrator of the Estate of Jeffrey W. Lucas, and the Estate of Jeffrey W. Lucas as parties to this appeal.

## Facts and Procedural History

On March 31, 1991, at approximately 2:45 a.m., Jeffrey Lucas was a passenger in a vehicle stopped by campus police for a traffic violation at California Polytechnic University. Apparently, without the officers' knowledge, Lucas swallowed a plastic bag of methamphetamine at the time of the stop. Lucas was arrested on an outstanding warrant. Lucas's eyes were red and watery but he denied having consumed alcohol or drugs. His pupils did not react abnormally to a nystagmus test. When Officer Foley walked Lucas to the jail booking entrance, he said he had some "pot" in his pocket. Foley asked if Lucas had used any drugs that day and he answered "No." Foley found 2.7 grams of marijuana in Lucas's pocket.

When asked during booking whether he had any medical problems, Lucas responded in the negative and signed the booking medical screening and the booking property statement. He was cited for violations of Health and Safety Code section 11357, subdivision (b), and for outstanding warrants. Lucas asked if he could remove his shirt. When Foley asked if he were feeling well, Lucas said he was just "a little hot." Lucas removed his shirt and signed the citations.

At 5:10 a.m., Deputy Landers performed a jail cell check and noticed that Lucas had moved his mattress to the floor and appeared to be asleep. At 6:30 a.m., Deputy Landers heard a knocking from the jail area and found Lucas in the same position on the mattress. When another inmate indicated that Lucas had caused the disturbance, Landers asked Lucas what was wrong. Lucas told Landers that he was claustrophobic. Landers took Lucas to the booking area and noted that Lucas was visibly trembling and walking stiff legged. Landers again asked if Lucas was all right and again Lucas stated that he was just claustrophobic.

On the way to the booking area, Lucas asked to use the restroom. Lucas went to the sink and began splashing water on his face and commented, "Look at my eyes, I look like a mess." Landers, who was going off duty, told Deputy Goff that Lucas said he was claustrophobic and that Landers thought Lucas should be sent to central jail. Goff placed Lucas in a booking room and went to obtain approval for the transfer. Lucas asked Landers for a glass of water and was shaking so badly that he spilled most of it. Landers began to wonder if Lucas was having delirium tremens (D.T.'s) and asked if Lucas "did a lot of alcohol or drugs." Lucas replied that he did take drugs. When asked what type, he replied, "Everything, you name it." Landers asked if Lucas took any drugs prior to his arrest and Lucas said he took "a little pot."

Deputy Goff telephoned and received authorization to transfer Lucas to central jail at 7:10 a.m. At approximately 7:30 a.m. Deputy Radovic arrived

to transport Lucas. Goff helped Lucas to his feet. Lucas was shaking and sweating and Radovic and Goff had to help steady him. Goff thought that Lucas was going into D.T.'s and should be transferred to the main jail where medical facilities were available should they be needed. Landers, who was still at the station, noticed that Lucas was now dragging his feet but walked to the radio car. Lucas was placed on his stomach on the back seat due to his shaking. Deputy Radovic noticed that Lucas was breathing "hard" but appeared to be coherent. Lucas appeared to Radovic to be having withdrawals from alcohol or drugs.

On route to the central jail, Radovic monitored Lucas by occasionally looking over his shoulders and listening to his "very heavy breathing." He could see Lucas's body shaking. At approximately 7:58 a.m., Radovic sent a message that he was two minutes away from the central jail and to please have deputies waiting by the hospital back door to assist him. When he arrived at 8 a.m., no deputies were waiting. He spent several minutes finding a telephone to request help. He checked Lucas and saw that he was still shaking and breathing heavily.

At 8:05 a.m. Radovic called the watch deputy and told her a prisoner was having D.T.'s and he wanted admittance. He was first told that the back door was for persons under the influence of phencyclidine (PCP) but Radovic prevailed upon the sergeant to have hospital deputies meet him at the back door. When Radovic got back in the car and started to back out to go to the hospital door, he noticed that Lucas was no longer breathing. Radovic went immediately to the hospital back door and notified the control booth that his prisoner was not breathing. Seconds later officers came out and helped remove Lucas from the car and checked Lucas's vital signs. Nurses responded at 8:12 a.m. and commenced cardiopulmonary resuscitation until paramedics arrived and took Lucas to the county hospital. At approximately 8:56 a.m., Lucas was pronounced dead. An autopsy revealed plastic material in his stomach. Lucas died of an apparent overdose of methamphetamine.

On March 23, 1992, appellant filed an action in the United States District Court, pursuant to 42 United States Code section 1983 (section 1983), for damages arising from the death of Lucas for violation of civil rights.[2] The complaint alleged violation of Lucas's Fourth Amendment rights, deliberate indifference in maintaining and permitting an official policy and custom of permitting the types of wrongs alleged, failure to properly train police officers such that the training is deliberately indifferent to the rights of citizens, wrongful death and negligent entrustment.

---

[2]Appellant also filed a complaint in state court in March 1992 for violation of civil rights and pendent state claims. That case was apparently dismissed at some point.

Respondents moved for summary judgment March 15, 1993, claiming, inter alia, qualified immunity on the federal claims. The district court granted summary judgment on appellant's federal civil rights claims but declined to exercise pendent jurisdiction on the state claims. The district court made the following pertinent conclusions of law: 1) the individual officers were not " 'deliberately indifferent' " to the " 'serious' " medical needs of Lucas; 2) the individual officer took reasonable action regarding the obtaining of medical care for Lucas; 3) the County had a policy of providing medical care to inmates which was followed and nothing about the existence or nonexistence of a policy led to the officers' denying Lucas his civil rights; 4) the federal court dismissed the pendent state claims because it is not required to retain jurisdiction if the federal claims are dismissed.

On March 19, 1993, subsequent to the hearing on the motion for summary judgment and prior to entry of judgment, appellant filed the instant state court action, alleging negligence, negligent entrustment and wrongful death. Respondents demurred to that complaint, claiming, among other things, that the complaint was barred by res judicata based on the federal court's decision. The trial court overruled that part of the demurrer based upon the doctrine of res judicata, stating that "the federal court was determining whether an affirmative defense of qualified immunity had been established. Some elements of negligence were not addressed in the federal action and the defense of qualified immunity is not available in the state court action."

Respondents subsequently moved for summary judgment on grounds that 1) primary assumption of the risk is a total bar to appellant's right to recover; 2) any breach of duty by respondents was not a substantial factor in Lucas's death; 3) respondents are entitled to immunity pursuant to Government Code sections 845.6 and 855.6;[3] and 4) the district court had previously determined that respondent law enforcement officers were not deliberately indifferent to Lucas's medical needs. The court denied the summary judgment, ruling in pertinent part, "There is at least one triable issue of fact, whether the defendants knew or reasonably should have known that plaintiff needed immediate medical attention. (See Goff, Radovic, Sedita, and Landers affidavits). . . ."

---

[3]Government Code section 845.6 provides immunity to a public entity or public employee for injury proximately caused by failure to furnish or to obtain medical care for a prisoner in custody, but provides limited liability where the employee is acting within the scope of his employment and the employee knows or has reason to know that the prisoner is in need of immediate medical care and fails to take reasonable action to summon such medical care.

Government Code section 855.6 provides immunity from liability "for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others."

On the eve of trial in January 1995, respondents submitted a trial brief raising the immunities of Government Code section 845.6 and res judicata and collateral estoppel, and a motion to exclude evidence and for res judicata effect of the federal statement of decision and findings of fact and law. Respondents also filed a motion for judgment on the same grounds. In its statement of decision, the trial court phrased the issue as the "res judicata effect of a conclusion of law in a related federal case that 'the individual officers took reasonable action regarding obtaining of medical care for Jeffrey Lucas' on the present state case which tests whether the exception from governmental immunity under Government Code 845.6 in cases where '. . . the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care[]' can be established. Gov't Code 845.6."

The trial court ruled that the conclusion of law which came from the federal court determination necessarily included a determination on all of the issues raised in this pending suit and must be accorded res judicata effect. The court stated that its determination removed the only issue remaining in the lawsuit and that proceeding at this time to trial would be useless. The court was uncertain about the proper procedural vehicle to reach its result. The court ultimately relied on the "inherent power to avoid waste of judicial and court time and resources," and awarded judgment to defendants.

## DISCUSSION

### 1. *Trial Court's Procedure Not Improper*

Both parties agree that since the trial court's judgment rests on a question of law, its ruling is subject to independent or de novo review. Appellant, however, asserts that the trial court should not have entertained respondents' motion for judgment since it was, in essence, a motion for judgment on the pleadings, and there was no material change in applicable law or statute as required by Code of Civil Procedure section 438, subdivision (g)(1). Appellant also asserts that the trial court could not reconsider the motion for summary judgment previously denied because Code of Civil Procedure section 1008 unequivocally provides that no application for reconsideration of an order or for renewal of a previous motion may be considered unless made according to its provisions.

A court has inherent equity, supervisory and administrative powers, as well as inherent power to control litigation and conserve judicial resources. (*Cottle* v. *Superior Court* (1992) 3 Cal.App.4th 1367, 1377 [5 Cal.Rptr.2d 882].) Courts can conduct hearings and formulate rules of

procedure where justice so demands. (*Walker* v. *Superior Court* (1991) 53 Cal.3d 257, 267-268 [279 Cal.Rptr. 576, 807 P.2d 418]; *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 287 [245 Cal.Rptr. 873]; see also *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704 [30 Cal.Rptr.2d 306].) Entertaining a motion *in limine* as the court did here falls within these powers where the court believed that ". . . even if the plaintiff's allegations were proved, they would not establish a cause of action. [Citation.]" (*Clemens* v. *American Warranty Corp.* (1987) 193 Cal.App.3d 444, 451 [238 Cal.Rptr. 339].)

■ Additionally, a court may grant a judgment of nonsuit after the plaintiff has presented its evidence when no substantial evidence exists to support an element of plaintiff's case or where plaintiff's evidence establishes an affirmative defense which defeats a cause of action. (*Castaneda* v. *Bornstein* (1995) 36 Cal.App.4th 1818, 1824-1825 [43 Cal.Rptr.2d 10].) Consequently, the trial court's grant of a motion *in limine* or motion for nonsuit before argument to a jury, although irregular, was not procedurally improper.

## 2. *Res Judicata and Collateral Estoppel*

Appellant asserts that the court erred in ruling that the federal court decision precluded the state court claims. She argues that the federal court specifically declined to hear those causes of action so that they could be pursued in state court. ■ Res judicata operates as a bar to maintaining a second suit between the same parties or parties in privity with them on the same cause of action. (*Branson* v. *Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 340 [29 Cal.Rptr.2d 314]; *Gamble* v. *General Foods Corp.* (1991) 229 Cal.App.3d 893, 898 [280 Cal.Rptr. 457].) However, where a judgment is not rendered on the merits, it does not operate as a bar. (*Koch* v. *Rodlin Enterprises* (1990) 223 Cal.App.3d 1591, 1596 [273 Cal.Rptr. 438].) Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief. (*Boccardo* v. *Safeway Stores, Inc.* (1982) 134 Cal.App.3d 1037, 1043 [184 Cal.Rptr. 903].)

Respondents counter that appellant's primary right under her section 1983 federal claim and her Government Code section 845.6 claim is the same. ■ Federal courts and state courts define a cause of action differently. (*Gamble* v. *General Foods Corp., supra,* 229 Cal.App.3d 893, 898.) California courts, unlike federal courts, follow the primary rights theory of Pomeroy: a cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding duty imposed upon the defendant, and 3) a

wrong done by the defendant which is a breach of such primary right and duty. (*Ibid.*; accord, *Branson* v. *Sun-Diamond Growers*, *supra*, 24 Cal.App.4th 327, 341.) Under California law, res judicata effect is determined on the basis of whether the prior federal judgment is based on the same primary right as the state action. (*Gamble*, *supra*, at p. 898.) If there is but one primary right and one wrong done involving that right, the plaintiff has but a single cause of action, no matter how many kinds of relief or theories are relied upon. (*Branson*, *supra*, at p. 341.)

This theory of primary rights does not aid respondent because, as the trial court astutely observed, it was not appellant who made the decision to "split" causes of action between state and federal court. Appellant tendered the entire case to the federal court, which had pendent jurisdiction to determine the state causes of action but declined to exercise it. (See *Victa* v. *Merle Norman Cosmetics, Inc.* (1993) 19 Cal.App.4th 454, 463 [24 Cal.Rptr.2d 117]; *Merry* v. *Coast Community College Dist.* (1979) 97 Cal.App.3d 214, 229 [158 Cal.Rptr. 603].) ■ A federal court's discretionary refusal to exercise pendent jurisdiction over a state claim does not bar further litigation of the state claim in state court. (*Boccardo* v. *Safeway Stores, Inc.*, *supra*, 134 Cal.App.3d 1037, 1047.) The correct question recognized by the trial court is not whether a state claim could be brought, but rather the effect that must be accorded a conclusion of law in a related case on the same facts. That is a question of collateral estoppel.

■ Collateral estoppel " '. . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " (*People* v. *Santamaria* (1994) 8 Cal.4th 903, 912 [35 Cal.Rptr.2d 624, 884 P.2d 81]; see also *Branson* v. *Sun-Diamond Growers*, *supra*, 24 Cal.App.4th 327, 346; *Gikas* v. *Zolin* (1993) 6 Cal.4th 841, 848 [25 Cal.Rptr.2d 500, 863 P.2d 745].) Several threshold requirements to the doctrine must be met: 1) the issue sought to be precluded must be identical to that decided in a former proceeding; 2) the issue must have been actually litigated in the former proceeding; 3) it must have been necessarily decided in the former proceeding; 4) the prior decision must be final and on the merits; and 5) the party against whom preclusion is sought must be the same or in privity with the party in the prior proceeding. (*Branson*, *supra*, at p. 346.) The doctrine of collateral estoppel applies on issues litigated even though some factual matters or legal arguments which could have been raised were not. (*Ibid.*; see also *Mattson* v. *City of Costa Mesa* (1980) 106 Cal.App.3d 441, 445 [164 Cal.Rptr. 913].)

Appellant asserts that where the prior action was decided on summary judgment, findings and conclusions of law made in the federal court are not

binding. This assertion is true where the federal courts did not decide the merits of the claim or entered judgment on a procedural or technical basis. (See, e.g., *Merry* v. *Coast Community College Dist.*, *supra*, 97 Cal.App.3d 214, 227 [plaintiff failed to state a claim on which relief could be granted under federal law]; *Koch* v. *Rodlin Enterprises*, *supra*, 223 Cal.App.3d 1591, 1596 [statute of limitations is deemed a technical or procedural, rather than a substantive, determination]; *Musick* v. *Burke* (9th Cir. 1990) 913 F.2d 1390, 1399 [no precedential or res judicata effect where basis of summary judgment is lack of jurisdiction].) Here, however, the federal court did not grant summary judgment because of lack of jurisdiction or procedural defect. Appellant simply failed to establish her case under federal law. The judgment was on the merits.

## 3. *Does "Reasonable" Always Mean "Reasonable"?*

■ Appellant contends that what is "reasonable action" within the context of qualified immunity in a section 1983 federal action is not "reasonable action" for a state law negligence claim. The parties acknowledge that the record before the federal court was the same as that before the trial court in the instant action. In the federal action, appellant had to prove deliberate indifference to a prisoner's serious illness or injury to prevail on a cause of action under section 1983. (*Estelle* v. *Gamble* (1976) 429 U.S. 97, 105 [50 L.Ed.2d 251, 260-261, 97 S.Ct. 285].) Deliberate indifference to serious medical needs of prisoners entails " '. . . unnecessary and wanton infliction of pain.' " (*Ibid.*) Mere negligence is insufficient to meet this standard which describes a state of mind more blameworthy. (*Farmer* v. *Brennan* (1994) 511 U.S. 825, __ [128 L.Ed.2d 811, 824, 114 S.Ct. 1970]; *Wilson* v. *Seiter* (1991) 501 U.S. 294, 305-306 [115 L.Ed.2d 271, 283-284, 111 S.Ct. 2321].) "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." (*Farmer*, *supra*, at p. __ [128 L.Ed.2d at p. 825].)[4]

The United States Supreme Court indicated in *Farmer* that even if prison officials actually knew of a substantial risk to inmate health or safety, they may be found free from liability if they responded reasonably to the risk, even though the harm ultimately was not averted. (511 U.S. 825, __ [128 L.Ed.2d 811, 830].) "Whether one puts it in terms of duty or deliberate

---

[4]In *Farmer* v. *Brennan*, *supra*, 511 U.S. 825, __ [128 L.Ed.2d 811, 820], the United States Supreme Court held that "deliberate indifference" requires a showing that the official was *subjectively* aware of the risk. The court indicated that previously Courts of Appeals routinely equated deliberate indifference with recklessness. (*Id.*, at pp. __-__ [ 128 L.Ed.2d at pp. 824-825].) *Irwin* v. *City of Hemet* (1994) 22 Cal.App.4th 507 [27 Cal.Rptr.2d 433], upon which respondents rely, appears to have been decided before *Farmer* since it uses an objective, rather than a subjective, test for deliberate indifference.

indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." (*Ibid.*)

Appellant argues that the federal court's ruling was restricted exclusively to the "deliberate indifference" and its conclusion that the individual officers took "reasonable action regarding the obtaining of medical care" for Lucas was directed to this "heightened standard of culpability." We agree. ■■ Liability of public entities and public employees under Government Code section 845.6 is limited to serious and obvious medical conditions requiring immediate care. (*Watson* v. *State of California* (1993) 21 Cal.App.4th 836, 841 [26 Cal.Rptr.2d 262].) Their duty to provide medical care to prisoners is limited to " '. . . cases where there is *actual or constructive knowledge* that the prisoner is in need of *immediate* medical care.' " (*Ibid.*) The public employee must know or have reason to know of the need of immediate medical care and fail to summon such care. (*Id.,* at pp. 841-842.)

■■ Respondents argue that the phrase "reason to know," as used in Government Code section 845.6, requires a subjective determination of whether defendants had the requisite degree of knowledge of a serious medical condition. They base this assertion on *Watson*'s statement that "[l]iability is limited to those situations where the public entity intentionally or unjustifiably fails to furnish immediate medical care." (21 Cal.App.4th 836, 841.) We are not persuaded that *Watson* meant to declare a subjective standard. To the contrary, the phrase "has reason to know" is the equivalent of an objective standard.

In the federal action, "should have known" had a different connotation to courts utilizing the objective standard before *Farmer* announced that the proper standard was subjective. "Because mere negligence will not support a Fourteenth Amendment claim, 'should have known' in this context 'is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. . . .' " (*Irwin* v. *City of Hemet, supra,* 22 Cal.App.4th 507, 523-524.) Consequently, we do not believe that Government Code section 845.6 employs a subjective standard of knowledge now required under federal law.

4. *Causation*

Respondents argue that we can uphold the trial court's judgment on the alternative ground of lack of causation since causation is an essential

element of appellant's claim of negligence. (See *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Jackson* v. *Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1847 [20 Cal.Rptr.2d 913].) According to respondents, it was not until 6:30 a.m. that any defendants had reason to suspect any problem with Lucas, and by that time it was too late. They assert that the trial court incorrectly denied summary judgment on this ground. They indicate that since the trial court based its ruling on the entire record, which it judicially noticed, that we, too, can consider the entire record in our appellate review. Although the court may have based its ruling on the entire record, it did not base its ruling on lack of causation even after reconsidering the question.

■  Causation is generally a question for the jury unless reasonable persons could not dispute the absence of causation, in which case it may be treated as a question of law. (*Thai* v. *Stang* (1989) 214 Cal.App.3d 1264, 1273-1274 [263 Cal.Rptr. 202]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 207 [223 Cal.Rptr. 645].) Respondents did not cross-appeal from the court's ruling on the earlier summary judgment in which they raised the issue of lack of causation. They argue, nonetheless, that ". . . an appeal from a nonseverable portion of a judgment brings to the appellate court for review *all* of the interwoven parts," all of which the reviewing court will consider to accomplish justice. (*American Enterprise, Inc.* v. *Van Winkle* (1952) 39 Cal.2d 210, 218 [246 P.2d 935]; *Everly Enterprises, Inc.,* v. *Altman* (1960) 54 Cal.2d 761, 765 [8 Cal.Rptr. 455, 356 P.2d 199].) In an action for negligence, the issue of causation would "permeate [all] portions of the judgment." (*American Enterprises, Inc., supra,* at p. 217.)

We have carefully reviewed the testimony of appellant's and respondents' experts on the issue of causation submitted on respondents' motion for summary judgment. Respondents' expert, Dr. Okun, stated that even if Lucas would have disclosed at 6:30 a.m. that he had ingested the drugs, efforts to save him would have been futile due to the quantity of methamphetamines that had entered his system. Appellant's expert, Dr. Silverman, stated in his deposition that if Lucas had been attended to, he would have survived. He stated that the oral ingestion of drugs would have a maximum effect "somewhere between two and four and two and six hours after injection [*sic*]." When asked what was the longest period of time that could lapse before treatment began that would successfully reverse the effect of the drugs, he replied, "He is dead at something like 8:50 or nine o'clock. . . . 7:00, 7:30; in that area." Respondent's counsel queried, "And my understanding from what you have told me is that the window of opportunity to reverse the course of injection is three to three and a half hours?" Dr. Silverman: "Assuming that he took it at 4:00 o'clock when he was arrested,

he could have had a successful conclusion at 7:30." Dr. Silverman also said that tolerance could affect the time in which treatment would be possible.

According to respondents, since Lucas was arrested at approximately 2:45 a.m., even under Dr. Silverman's opinion, it would have been too late to administer treatment at 6:30 a.m. True, one might reasonably draw this inference from Dr. Silverman's testimony. However, Dr. Silverman's statement that a treatment at 7:30 a.m. could have saved decedent's life was based on an assumption that the arrest took place at 4 a.m., not 2:45 a.m. That statement does not preclude, as a matter of law, the saving of decedent's life at a later time.

## CONCLUSION

It does not appear that "reasonable" meant the same in the context of "deliberate indifference" in the federal action as it does in regards to immunity under Government Code section 845.6. "Reasonable action" in terms of the "deliberate indifference" standard of cruel and unusual punishment under the federal Constitution is not identical to the standard for immunity under Government Code section 845.6. Moreover, we do not know whether the federal court utilized an objective or subjective test in its factual finding that Lucas's symptoms did not indicate that he was in need of immediate medical care. Consequently, we must reverse the judgment.

Costs to appellants.

Gilbert, J., and Yegan, J., concurred.