Filed 11/21/22 Vallejo v. Fire Insurance Exchange CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JOSE VALLEJO, | C091547 |
| Plaintiff and Appellant, | (Super. Ct. No. STKCVUIC20140008644) |
| v. | |
| FIRE INSURANCE EXCHANGE, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

In 2013, Jose Vallejo sought payment from Fire Insurance Exchange (Fire) of a default judgment he had secured against Fire's insureds, Marsha and Franklin Savoy. Vallejo had secured the default judgment in 2009, in a personal injury action he had brought against the Savoys and Marsha's father, Manual C. De La Garza. Fire denied Vallejo's claim, and Vallejo filed this action, alleging he was entitled to benefits under

1

Insurance Code section 11580, a breach of contract cause of action, and that Fire had breached the covenant of good faith and fair dealing when it denied his claim. A jury found in Vallejo's favor, and the trial court awarded Vallejo contract damages in the form of the amount due to him under the policy plus interest, damages for emotional distress, and attorney fees expended to collect the amount he was due under the policy under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt*).

On appeal, Fire argues that the Insurance Code section 11580 and breach of contract causes of action were time-barred by the time Vallejo filed this action. Central to Fire's position is its argument that a bankruptcy proceeding the Savoys filed after Vallejo secured his personal injury judgment but before he submitted a claim to Fire did not toll the statute of limitations applicable to the filing of Vallejo's claim under Insurance Code section 11580. On this point we agree with Fire. Because Vallejo secured a judgment against the Savoys before they filed for bankruptcy, the bankruptcy stay did not prevent him from filing an Insurance Code section 11580 or breach of contract action to collect funds from Fire during the pendency of the bankruptcy proceeding.

Fire also argues that Vallejo should not have been able to maintain an action alleging Fire breached the covenant of good faith and fair dealing when it denied his claim. On this point, we disagree with Fire, because while the statute of limitations on the Insurance Code section 11580 and contracts causes of action lapsed before Vallejo filed this action, that statute of limitations had not passed at the time Fire denied his claim. Vallejo has raised a convincing argument that the statute of limitations on his bad faith cause of action is different than the one that applied to the other two causes of action, and Fire has not made a convincing argument that it acted reasonably at the time it denied Vallejo's claim.

In this appeal, we also consider two arguments regarding the calculation of damages owed to Vallejo: one raised by Fire and the other raised in a cross-appeal by

2

Vallejo. We will conclude that Fire correctly argues that the contract damages award needs to be recalculated, and that Vallejo correctly argues the *Brandt* award ought to have included litigation costs.

## FACTS AND HISTORY OF THE PROCEEDINGS

### Fire Issued a Policy on the Savoys' Real Property covering the period from April 27, 2006, to April 27, 2007

In March 2005, De La Garza transferred interest in a house he owned (the property) to the Savoys. De La Garza continued to reside at the property after the transfer.

Fire, a Farmers Insurance entity, issued a landlord's protector insurance package (the policy) on the Savoy's property which covered the period of April 27, 2006, to April 27, 2007. Though De La Garza was not specifically named as an insured under the policy, the jury found that he was an insured under the policy and neither party has challenged the jury's finding on appeal. The policy included business liability coverage, under which Fire would pay "all damages from an occurrence which an insured is legally liable to pay because of bodily injury [or] personal injury . . . arising out of the ownership, maintenance, or use of the insured location covered by this policy."

The business liability coverage terms included a "*Suit Against Us*" provision, which stated, "[Fire] may not be sued unless there has been full compliance with the terms of this policy. No one shall have any right to make [Fire] a party to a suit to determine the liability of a person [Fire] insure[s]. [Fire] may not be sued under" the business liability coverage policy, "until the obligation of the insured has been determined by [a] final judgment or agreement signed by [Fire]." Under the terms of the business liability coverage, the "[*b*]*ankruptcy of an Insured* . . . will not relieve [Fire] of [their] duties under this policy."

The policy also contained liability coverage designated as "medical pay to others" coverage with a $1,000 per person limit. With certain qualifications, this coverage would be used to pay, "the necessary medical expenses incurred by a person other than an insured within three years from the date of an occurrence causing bodily injury" if the bodily injury, "arises from a condition on the insured location, and [¶] . . . arises from an occurrence for which an insured is covered under this policy."

According to the policy, the Savoys resided in Las Vegas at the time the policy was issued.

Vallejo's Injury in May 2006, the Personal Injury Action, and Default Judgments

During the policy coverage period, in May 2006, Vallejo was injured when he fell off a ladder while helping De La Garza remove a tree from the property.

According to Vallejo, after the injury, De La Garza would go along with Vallejo to medical visits to treat the injury, and he visited Vallejo at home. Though De La Garza told Vallejo he had insurance that could cover Vallejo's medical expenses, De La Garza told Vallejo he would pay for treatment, because De La Garza did not want to report the incident to the insurer and have the cost of insurance increase. When Vallejo needed to make a $300 deposit for surgery related to the injury, De La Garza covered the deposit with a credit card. When Vallejo received a medical bill showing a balance owing of over $14,000, he showed it to De La Garza, and De La Garza ceased contact with Vallejo and stopped paying for Vallejo's medical bills.

In July 2006, Vallejo retained an attorney, Jeffrey Silvia, to assist him in obtaining compensation for medical expenses incurred to treat the injuries he suffered. Vallejo represented to Silvia that De La Garza owned the property and had a homeowner's insurance policy. Silvia's office contacted De La Garza, who acknowledged that the policy existed but refused to provide the identity of the insurer.

4

On October 10, 2006, Vallejo filed a personal injury action against De La Garza for damages related to his injuries (underlying action). De La Garza did not file an answer, and on June 28, 2007, the trial court entered a default judgment in Vallejo's favor against De La Garza awarding total damages of $125,184.84 (De La Garza judgment).

When Silvia sought to record an abstract of judgment against the property, he learned that the Savoys owned the property at the time Vallejo was injured. As a result, in November 2007, Vallejo filed an amended complaint in the underlying action naming the Savoys as defendants.

A process server served the Savoys at the property using substitute service on De La Garza who told the process server the Savoys lived at the property with him, but worked long hours; and then De La Garza represented to the process server that he would give the documents to the Savoys. The record does not tell us what, if anything, De La Garza, who died in September 2009, ever told the Savoys about the personal injury action.

The Savoys did not file an answer, and on January 28, 2009, the trial court entered a default judgment in Vallejo's favor against the Savoys awarding total damages of $125,184.84 (Savoy judgment). In 2009 and 2010, Silvia made various efforts to identify the property insurer to no avail.

We note that in its opening brief, Fire describes these efforts—including how those efforts related to Vallejo's own chapter 7 bankruptcy proceedings—in more detail. Fire then argues that Vallejo and his counsel's alleged "diligence" did not toll the statute of limitations in this action. In his responsive brief, Vallejo does not argue that anything other than the Savoys' bankruptcy proceedings and Fire's representations regarding the impact of those proceedings tolled the statute of limitations. Additionally, we find persuasive Fire's argument that Vallejo did not need to know the name of the insurer to bring the action because (1) he was aware there was a liability insurer and that the predicate requirement—a judgment against the insured—for an Insurance Code section

5

11580 cause of action against that liability insurer existed when he secured the default judgments; and (2) he could have filed a timely action naming the insurer as a Doe defendant. (See *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 932; see also *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 ["The discovery rule, as described in *Bernson*, allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity. . . . As the court reasoned in *Norgart*[ *v. Upjohn Co.* (1999) 21 Cal.4th 383, 399], '[i]t follows that failure to discover, or have reason to discover, the identity of the defendant does not postpone the accrual of a cause of action, whereas a like failure concerning the cause of action itself does' "].)  Thus, the minute details of Vallejo's efforts to identify Fire are not important for our analysis.

According to the trial court's ruling on a motion for summary judgment in the instant action, "[t]he parties agree that between 2006 through 2012, [Vallejo] did not know where the Savoys were located and did not obtain any new information about any insurance policy."

In May 2017, Vallejo obtained a renewal of judgment as to all parties in the underlying action, adding $124,191.12 in interest accrued after the De La Garza judgment and a filing fee of $30 for the renewal application, for a total renewed judgment of $249,405.96.  In an attachment to his application for renewal of judgment, Vallejo noted that if interest were calculated on the judgment entered as to the Savoys, it would have been $104,332.44, instead.  Thus, if the total renewed judgment amount had been based on the Savoy judgment, the amount would have been $229,547.28.

The Savoys Filed for Bankruptcy in Nevada in 2012

On July 13, 2012, the Savoys filed for chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of Nevada (Bankruptcy Court).  The Savoys would later claim it was not until they began considering filing for bankruptcy that they learned Vallejo had secured a default judgment against them in the underlying action.

The Savoys identified Vallejo as a judgment creditor on their list of creditors holding unsecured nonpriority claims against them. The Savoys did not identify the Fire policy, or any interest in any insurance policy, on their schedule of assets. The Bankruptcy Court discharged the debtor—the Savoys—on October 15, 2012. On November 27, 2012, without Vallejo or his counsel ever learning about the Savoys' bankruptcy proceeding, the Bankruptcy Court issued a final decree in the Savoys' bankruptcy proceeding, closing the matter and discharging the trustee.

Vallejo's Efforts to Collect from Fire in 2013 and 2014

On July 9, 2013, after Silvia contacted American Bankers Insurance Co. of Florida (American) to see if it had been the liability insurer associated with the property in May 2006, American sent Silvia a letter, informing him that their records demonstrated the Fire policy was in effect on the date Vallejo was injured. This is the first time anyone told Silvia that Fire was the insurer. On July 18, 2013, Silvia wrote a letter to Fire in which he stated that a judgment had been entered against the Savoys in the amount of $125,184.84 and demanded that Fire satisfy the judgment.

On July 30, 2013, Lisa Newton, a field claims representative with Fire, wrote back to Silvia and informed him that Fire was investigating coverage in the case. "[H]owever," she added, "Mr. and Mrs. Savoy have indicated that they had the judgment discharged in bankruptcy in 2012 . . . in Clark County Nevada." Silvia then asked Newton to provide him with the bankruptcy case number and the identity of the Savoys' bankruptcy attorney. Newton provided Silvia with the requested information and, in her August 8, 2013, letter transmitting the information, wrote, "[a]s we have discussed, Mr. and Mrs. Savoy filed [for] bankruptcy in Clark County Nevada and discharged the judgment at that time. Neither were aware that Manual De La Garza was ever served naming them as defendants in this matter and Mr. De La Garza died in 2009." The letters between Silvia and Newton identify claim unit number 8001847946-1-2.

7

In late August and early September 2013, Silvia communicated with another Fire representative who did process a medical-payment claim for Vallejo. Fire paid Vallejo $1,000, the maximum medical payment it concluded was allowed under the policy. In the September 20, 2013, cover letter transmitting the $1,000 payment and informing Vallejo that available medical benefits were exhausted with that payment, the Fire claims representative wrote, "California laws and regulations require that we provide you with the four year limitation period upon which we may rely to deny a claim." The letters to Silvia from Fire regarding the medical payment are identified with claim unit number 8001847946-1-3.

On October 24, 2013, Newton made a note to Fire's file on Vallejo's claim that as they had not "heard back" from Silvia or the Savoys, Fire would close the file, but they would reopen the file if Silvia sent "further correspondence and needs additional infor[m]ation."

Meanwhile, Silvia consulted with a bankruptcy counsel in California, and located a bankruptcy attorney in Nevada to assist him with navigating issues that stemmed from the Savoys' bankruptcy case.

On January 10, 2014, Vallejo's Nevada bankruptcy counsel filed an ex parte motion to reopen the Savoys' bankruptcy case, and a motion to modify the stay to allow Vallejo to name the Savoys nominally in order to pursue insurance policy proceeds under the policy. The Bankruptcy Court granted the request to reopen the matter. Fire learned about the motion to modify the stay, and initially considered opposing the motion, but no record of it filing an opposition is identified on the register of actions for the bankruptcy action.

Notes from Fire's file state that as of February 6, 2014, Fire had reopened communications with Silvia and Vallejo's Nevada bankruptcy counsel, and Casey Corless, a claims supervisor with Fire, had communicated with them that it was her belief that there were some coverage and liability issues Fire needed to explore. More

8

specifically, she noted the Savoys had not given Fire any notice of the claims until the summer of 2013, and it was Fire's belief that there had been some serious service of process issues in the underlying action against the Savoys. She advised Silvia that there had been a discharged bankruptcy action in Nevada, and there would be no active claim until and unless the Bankruptcy Court granted their motion for relief from the bankruptcy stay.

The Bankruptcy Court heard the motion to lift the automatic stay on February 12, 2104.

On February 19, 2014, Newton sent Silvia a letter denying Vallejo's claim. She wrote, "[w]e have completed our investigation and have determined that there is no coverage available for this loss." She provided no further explanation to Vallejo or his counsel in the letter.

However, also on February 19, 2014, Stewart Lewis, Fire's Northern California Litigation Manager, sent a letter to the Savoys, explaining why Fire had concluded "there is no coverage provided for this [Vallejo's] loss" under the policy. This letter was also prepared by Newton. First, Fire concluded that De La Garza was a tenant of the Savoys on May 15, 2006, and, therefore, no coverage was available to him under the policy. With respect to the Savoys, Fire wrote, "Fire Insurance Exchange was not notified of the accident that occurred on May 15, 2006 until the claim was reported [to] us on July 18, 2013. Moreover, Fire Insurance Exchange was not notified that a lawsuit had been served on Franklin and Marsha Savoy or that a default judgment had been entered against Franklin and Marsha Savoy on January 28, 2009. Failure to notify Fire Insurance Exchange of the lawsuit and judgment entered against Franklin and Marsha Savoy is a material breach of your duties under the policy. [¶] Based on the foregoing, Fire Insurance Exchange does not owe you a defense of indemnity obligation under the referenced policy."

9

Newton admitted at trial that the letter does not state Fire had identified any prejudice to it as a result of the Savoys' failure to notify them, and that the letter would have included a comment about prejudice to Fire if she had identified any prejudice that had occurred to Fire as a result of the Savoys' failure to notify Fire. She also admitted that while the letter did identify the Savoys' failure to notify Fire of Vallejo's claim before judgment was entered in the underlying action as a basis for the denial, it did not "identify the delay from the [entry of the] judgment" in the underlying action and the date the claim was submitted to Fire as a factor.

On February 24, 2014, the Bankruptcy Court granted the motion to modify the automatic stay in the Savoys' bankruptcy action. The order says, "**IT IS HEREBY ORDERED** the Motion to Modify the Automatic Stay to Name Debtors Nominally to Pursue Insurance Policy and Waive the 14-Day Stay under Rule 4001(a)(3) is GRANTED in its entirety; [¶ ] **IT IS FURTHER ORDERED** that the bankruptcy case shall be closed thirty (30) days after the entry of this Order; and [¶] **IT IS FURTHER ORDERED** that any ensuing pleadings filed by Mr. Vallejo against Farmers Insurance shall note in the caption that Debtors are only named nominally, and the pleadings shall state that the Discharge of the Debtors was entered in the Bankruptcy Court on October 15, 2012, as Docket No. 31."

This Action

Complaints and Demurrers

Vallejo first filed this action on August 26, 2014, alleging only one cause of action: a complaint for damages under Insurance Code section 11580. In a first amended complaint filed on March 30, 2017, Vallejo added two causes of action: one for breach of contract, and another for compensatory and punitive damages as a result of insurers' breach of the covenant of good faith and fair dealing (bad faith) for refusing to pay the personal injury judgment. Fire demurred to the first amended complaint, and Vallejo

10

filed a second amended complaint, to which Fire also demurred. After the trial court sustained Fire's demurrer to the second amended complaint with leave to amend, Vallejo filed the operative complaint, the third amended complaint, in September 2017, which also alleges an Insurance Code section 11580 cause of action, a breach of contract cause of action, and bad faith cause of action. Fire also demurred to the third amended complaint.

Fire filed a supplemental brief in support of its demurrer responding to a request the trial court made to address whether the statute of limitations to bring the action ran from Vallejo providing notice of the claim in 2013 or from the date the Bankruptcy Court lifted the stay in the bankruptcy action. Fire argued that the stay in the bankruptcy case did not bar Vallejo from bringing an action against Fire—which Fire characterized as a non-debtor defendant—during the stay, and, therefore, the bankruptcy stay did not toll the statute of limitations for this action against Fire.

The trial court overruled Fire's demurer to the third amended complaint, and Fire filed an answer.

### Fire's Other Efforts to Dismiss the Case Based on Statute of Limitations Issues

Fire made other efforts to dismiss the action on the ground that Vallejo had failed to meet the statute of limitations.

First, Fire filed a motion for summary judgment or summary adjudication, in which it argued Vallejo's Insurance Code section 11580 cause of action was time-barred by the statute of limitations; that because his Insurance Code section 11580 cause of action was time-barred, so too was Vallejo's breach of contract cause of action; and that Vallejo's bad faith cause of action must fail because no benefits were due to Vallejo.

Among other theories, in opposition to the motion for summary judgment, Vallejo argued his case against Fire would have been tolled from when the Savoys filed the

11

bankruptcy action in July 2012 to the date his motion for relief from the bankruptcy stay was granted on February 24, 2014. The trial court denied Fire's motion for summary judgment or summary adjudication. In so doing, the court cited case law to support the proposition that a four-year statute of limitations under Code of Civil Procedure section 337 calculated from the date judgment was entered in the underlying action applied to the Insurance Code section 11580 cause of action, and then it—incorrectly—stated Vallejo filed this action within one year of the entry of the judgment in the underlying action.

Next, Fire brought a motion for judgment on the pleadings, in which it argued that the lawsuit, filed 5.5 years after entry of judgment in the underlying personal injury action, was time-barred under a four-year statute of limitations that began to run when the personal injury judgment was final. Fire again argued the breach of contract cause of action was not separate from the Insurance Code section 11580 cause of action and was, therefore, subject to the same statute of limitations as the underlying Insurance Code section 11580 cause of action. Also, Fire argued Vallejo could not argue the statute of limitations was tolled by waiver or estoppel theories based on Fire's representations in the September 20, 2013, cover letter regarding a four-year time frame to challenge the denial of a claim.

Additionally, Fire argued Vallejo could not maintain a bad faith claim independent of the Insurance Code section 11580 claim. Fire reasoned that if Vallejo's Insurance code section 11580 action was time-barred, Vallejo could have no separate claim for bad faith. In opposition to the motion for judgment on the pleadings, Vallejo once again argued the statute of limitations had, in fact, been tolled between July 13, 2012, and February 24, 2014, due to the bankruptcy action. The trial court denied the motion.

Vallejo's Motion in Limine Regarding the Bankruptcy Stay

In contrast to Fire's efforts to convince the trial court that the bankruptcy stay caused by the Savoys' bankruptcy filing had no tolling impact on the applicable statute of

12

limitations, Vallejo sought to exclude "all requested arguments, evidence, etc. by [Fire] that the bankruptcy stay of 11 U.S.C. § 362 arising from the bankruptcy filing and case of Franklin Savoy and Marsha Savoy <u>did not</u> apply to the Farmers' policy of insurance as to [Vallejo]" during the trial proceedings.

At an initial hearing regarding the motion, the court reserved its ruling on the matter and gave the parties the opportunity to provide further briefing regarding the impact and length of the bankruptcy stay. At the second hearing on the motion, the trial court concluded the bankruptcy stay applied as a matter of law and created an injunction that prevented Vallejo from seeking payment under the policy. As such, the court tentatively stated it would rule in Vallejo's favor on the motion and exclude any evidence Fire might produce to suggest the stay did not apply to the policy. After hearing additional argument from Fire, the court acknowledged that "the Ninth Circuit is not really consistent with all these things" when it comes to determining if bankruptcy stays would have tolled the action against an insurer, and "there's some language that supports [Fire's] side" of the argument. Yet, recognizing this issue had been presented to it "as a matter of law" the judge stated it had to "make a decision." The court ruled, its decision "may be" one "of first impression or . . . might be limited to the facts of the case. If I'm wrong, then I'm wrong, but I have to make a decision. My decision is going to be to side with the plaintiff on this," and it ruled the stay remained in place until it was lifted by the Bankruptcy Court, tolling the statute of limitations over 500 days, thereby tolling the statute of limitations to file this action beyond the date it was filed. Because it found that the stay had tolled the statute of limitations beyond the date this action was filed, the court excluded evidence that the bankruptcy stay should not apply as "irrelevant."

<u>Trial and Judgment</u>

The court conducted a trial in this action in late July and early August 2019.

13

The jury found that De La Garza was an insured under the policy; that Fire had not been prejudiced by the Savoys' failure to give them notice prior to July 18, 2013; that Fire's failure to pay Vallejo's judgment was unreasonable; that Vallejo was entitled to $165,000, in emotional distress damages covering the period of February 19, 2014—the date Fire denied the claim—to the date the verdict was entered; and that Vallejo did not prove by clear and convincing evidence that Fire had acted with malice, oppression, or fraud in its failure to pay Vallejo.

After the jury reached its verdict, Vallejo made a request for an award of attorney fees and costs on the bad faith cause of action under *Brandt, supra,* 37 Cal.3d 813. At a hearing, the trial court determined that Vallejo was entitled to $445,092 in *Brandt* fees and did not award additional costs under *Brandt*. Regarding its decision to not award costs, the court explained, "I've read the cases. The cases talk about attorney's fees. There's only one reference in there that mentions costs, and it's . . . in one of the cases that this happens to be quoting some other source and puts the word costs in there. I think it's dicta. I don't think it was discussed in that case. I didn't see any authority that would include the costs as you've described them . . . as part of the [*Brandt*] fees. . . . So you got an argument there, but I'm not going to award them at this point."

At the hearing when the court considered *Brandt* fees, the trial court granted a request Vallejo made for prejudgment interest on the renewed judgment, calculated from the date of renewal, May 30, 2017, to the date of the hearing, which was December 18, 2019. Applying an interest rate of 10 percent per annum, the trial court calculated the interested to be $24,940.59 per year, or $68.33 per day, for a total of $63,683.56 covering May 30, 2017, to December 18, 2019.

On January 3, 2020, the trial court entered a judgment in which, pursuant to the jury's verdict and its ruling following the hearing on *Brandt* and prejudgment interest fees, the court awarded Vallejo a total of $923,181.52, as follows: the amount due on the

renewed personal injury action totaling $249,405.96; pre-judgment interest totaling $63,683.56; emotional distress damages of $165,000; and attorney fees of $445,092.

DISCUSSION

I

*Timeliness of Vallejo's Insurance Code Section 11580 Claim*

Fire argues that Vallejo failed to meet the statute of limitations to file an action against Fire pursuant to Insurance Code section 11580. Central to Fire's argument is its position that the stay in the Savoys' bankruptcy proceeding did not toll the statute of limitations for Vallejo to file this action.

Though Fire preemptively makes arguments regarding why other possible theories Vallejo might offer as to why the statute of limitations was tolled would lack merit, in his responsive brief Vallejo makes only two arguments as to why the statute of limitations was tolled on the Insurance Code section 11580 cause of action. First, Vallejo argues that the bankruptcy stay that went into effect pursuant to 11 U.S.C. section 362 when the Savoys filed for bankruptcy in Nevada stayed Vallejo's ability to bring this action against Farmers, and therefore tolled the applicable statute of limitations, from July 13, 2012, to February 24, 2014. Central to this argument is Vallejo's position that the Fire policy was an asset of the Savoy's bankruptcy estate. Second, Vallejo makes the argument that Fire should be equitably estopped from arguing the bankruptcy stay did not toll the action, because Fire represented to him that the stay did apply and "refused to even accept or deny the clam until relief from the automatic stay was obtained."

Here we conclude that because Vallejo obtained a judgment against the Savoys before they filed for bankruptcy, the stay in the Savoys' bankruptcy action did not bar Vallejo from filing this action against Farmers and, therefore, the stay did not toll the statute of limitations for him to file this action. We also conclude that principles of equitable estoppel did not apply to toll the statute of limitations for Vallejo to file this

15

action. However, we do conclude Vallejo's claims were not yet time-barred as to the Savoy judgment when he submitted his claim to Fire, and equitable tolling did apply from the date Vallejo submitted his claim to Fire to the day Fire denied his claim. Yet even with that equitable tolling, Vallejo still did not meet the statute of limitations to file his Insurance Code section 11580 cause of action.

A.    <u>Nature</u> <u>of</u> <u>Insurance</u> <u>Code</u> <u>Section</u> <u>11580</u> <u>Actions</u>

Insurance Code section 11580, subdivision (b) requires liability insurance policies issued in California to contain: "(1) A provision that the insolvency or bankruptcy of the insured will not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of such policy[;]" and "(2) A provision that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." " 'The primary purpose of the statute is to protect an injured person when the insured is bankrupt or insolvent.' " (*Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 682.)

This statute, "effectively makes an injured plaintiff who obtains a final judgment against a tort defendant a third party beneficiary of the defendant's liability insurance policy." (*Catholic Mutual Relief Society v. Superior Court* (2007) 42 Cal.4th 358, 367; see also *Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847, 1856; *Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943.) Under the statute, "once having secured a final judgment for damages, the plaintiff becomes a third party beneficiary of the policy, entitled to recover on the judgment on the policy. At that point the insurer's duty to pay runs contractually to the plaintiff as well as the insured." (*Hand,* at p. 1858.) Thus, "[u]pon obtaining a judgment against the insured, the judgment creditor has an independent cause of action against the insurer to enforce the insurer's obligation to

16

indemnify the insured. (*Gonzalez v. St. Paul Mercury Ins. Co*. (1976) 60 Cal.App.3d 675, 680-681.) 'The judgment creditor's right to sue is not derivative or dependent upon any assignment from the insured.' (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 15:1039, p. 15-187.)" (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68.) "[I]t is clear from the history of the statute that its purpose and effect were to create a right in the insurance contract." (*Hand*, at pp. 1858-1859.)

Consequently, Insurance Code section 11580 allows a judgment creditor to file a "direct action against an insurer based on the insured's underlying insurance policy." (*Guastello v. AIG Specialty Ins. Co.* (2021) 61 Cal.App.5th 97, 100, fn. 1; see also *Clark v. California Ins. Guarantee Assn.* (2011) 200 Cal.App.4th 391, 397.) The judgment creditor's claim will be subject to the terms and limitations of the insurance policy. (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, *supra*, 107 Cal.App.4th at p. 68.)

B.     Without Tolling Insurance Code Section 11580 Causes of Action Have a Four-Year Statute of Limitations

An Insurance Code section 11580 cause of action against an insurer by an insured's judgment creditor is governed by the four-year statute of limitations prescribed by section 337, former subdivision (1), now subdivision (a), of the Code of Civil Procedure. (*Woolett v. American Employers Insurance Co.* (1978) 77 Cal.App.3d 619, 624.) The cause of action arises, and the statute of limitations begins to run, when a final judgment against an insured has been entered. (*Woolett*, at p. 624; see also *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 662.) For purposes of determining when a cause of action arises under Insurance Code section 11580, a judgment is " 'final' . . . after an appeal is concluded or the time within which to appeal has passed." (*McKee v. National Union Fire Ins. Co.* (1993) 15 Cal.App.4th 282, 287.) Absent exceptions not

applicable here, the last day a party can possibly appeal a judgment is 180 days from the date of entry of the judgment. (Cal. Rules of Court, rule 8.104.)

The trial court entered the De La Garza judgment on June 28, 2007. At the latest, for purposes of our calculations, the De La Garza judgment became final on December 26, 2007. (See Cal. Rules of Court, rules 1.10(b) & 8.104; see also *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741 [Code Civ. Proc., § 904.1, subd. (a) "authorizes appeal . . . from a judgment that is not intermediate or nonfinal but is the one final judgment. . . . Judgments that leave nothing to be decided between one or more parties and their adversaries, or that can be amended to encompass all controverted issues, have the finality required by section 904.1, subdivision (a)"]; *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437 [finding judgments were final and appealable as to plaintiff's claims against some of the defendants in a multidefendant lawsuit even though claims remained pending against other defendants].) Without tolling, the last day Vallejo had to file an Insurance Code section 11580 action based on the De La Garza judgment was December 26, 2011.

The trial court entered the Savoy judgment on January 28, 2009. At the latest, for purposes of our calculations, the Savoy judgment became final on July 27, 2009. (See Cal. Rules of Court, rule 8.104.) Absent tolling, the last day to file an Insurance Code section 11580 action based on the Savoy judgment would be July 29, 2013, because July 27, 2013, was a Saturday. (See Code Civ. Proc., § 12a.) When Vallejo made his claim to Fire on July 18, 2013, he had 11 days left to file an Insurance Code section 11580 action predicated on the Savoy judgment.

C. *Equitable Tolling Applied While Fire Considered the Claim*

Without wholly conceding the point, Fire allows that it is possible that equitable tolling applied to toll the statute of limitations while Fire considered Vallejo's claim based on the Savoy judgment. Fire argues that equitable tolling would not have applied

18

to toll the statute of limitations as to an action related to the De La Garza judgment, because the statute of limitations on that claim had already lapsed by the time Silvia contacted Fire.

The four years Vallejo had to bring his Insurance Code section 11580 action against Fire regarding the Savoy judgment was tolled from the time he sought to resolve the claim directly with Fire to the day Fire denied the claim. "In *Elkins v. Derby* (1974) 12 Cal.3d 410, 414 (*Elkins*), the Supreme Court held that the doctrine of equitable tolling may apply to toll the statute of limitations on a claim during the period in which a plaintiff pursues another remedy for the harm that the plaintiff suffered. The *Elkins* court adopted a line of cases in which courts had concluded that 'if the defendant is not prejudiced thereby, the running of the limitations period is tolled "[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one." ' (*Id.* at p. 414, quoting *Myers v. County of Orange* (1970) 6 Cal.App.3d 626, 634 (*Myers*).)" (*Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 746.)

However, as Fire observes, only 11 days remained on the four-year statute of limitations to bring an action regarding the Savoy judgment when Vallejo made his claim, and Fire denied his claim on February 19, 2014. As Fire argues the February 19, 2014, denial would have restarted—but not reset—the clock on the statute of limitations, extending the deadline to file a suit against Fire based on the Savoy judgment to March 3, 2014, still months before Vallejo filed this action on August 26, 2014.

We agree with Fire that equitable tolling would have had no impact on the statute of limitations for Vallejo to bring an action regarding the De La Garza judgment, because the statute of limitations on an action based on that judgment had passed well before Vallejo submitted a claim to Fire.

19

D.    Impact of the Bankruptcy Stay

1.    Basic Nature of a Bankruptcy Stay and Principles of Review

When a person files a petition for bankruptcy, the petition "operates as a stay" of "the enforcement, against the debtor *or against property of the estate*, of a judgment obtained before the commencement of the case under this title," and of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." (11 U.S.C. § 362(a)(2)-(3), italics added.) Property of the estate is defined to include, "all legal or equitable interests of the debtor in property as of the commencement of the case," and "[p]roceeds, product, offspring, rents, or profits of or from property of the estate . . . ." (11 U.S.C. § 541(a)(1) & (6).) It does not include, "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." (11 U.S.C. § 541(b)(1).)

" 'Whether property is property of the [debtor's] estate is a question of law reviewed de novo.' " (*Shaoxing County Huayue Import & Export v. Bhaumik* (2011) 191 Cal.App.4th 1189, 1196, quoting *In re Mwangi* (9th Cir. 2010) 432 B.R. 812, 818.)

The parties cite to California appellate court opinions and decisions issued in bankruptcy and circuit courts throughout the United States in advancing their arguments. "As explained by one federal court, 'while federal law defines in broad fashion what property interests are included within the bankruptcy estate, state law determines the nature and existence of a debtor's rights.' (*In re Moffett* (4th Cir. 2004) 356 F.3d 518, 521; see also *In re O'Dowd* (3d Cir. 2000) 233 F.3d 197, 202 ['While federal law defines what types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property.']; 2 Cowans, Bankruptcy Law and Practice (7th ed. 1998) § 9.2(b), p. 342 ['The question of what is "property of the estate" is a federal question, but state law determines the nature and quantum of interest' (fns. omitted)].)" (*Uecker v. Zentil* (2016) 244 Cal.App.4th 789, 794.)

20

Additionally, when deciphering the federal laws at issue, " '[o]n a federal question, the decisions of the United States Supreme Court are binding on state courts. However, the decisions of the lower federal courts, while persuasive, are not binding on us. (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) Thus, in the absence of a controlling United States Supreme Court opinion,' " which is the scenario we are faced with on the precise issue we address here, " 'we make an independent determination of federal law. Where the federal circuits are in conflict, the decisions of the Ninth Circuit are entitled to no greater weight than those of other circuits.' (*Irwin v. City of Hemet* (1994) 22 Cal.App.4th 507, 520, fn. 8.)" (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782-783; *id.* at p. 782 ["Jones also contends that there is no decision from the Ninth Circuit Court of Appeals on this issue, implying that we are bound to follow that court's lead on matters of federal law. That implication is mistaken"].)

<u>2.</u>    <u>The Savoys' Bankruptcy Action Did Not Toll the Statute of Limitations to Bring this Action</u>

As a preliminary matter, to state the obvious, as "*direct action[s] against an insurer* based on the insured's underlying insurance policy," Insurance Code section 11580 actions are not actions against bankruptcy debtors. (*Guastello v. AIG Specialty Ins. Co., supra*, 61 Cal.App.5th at p. 100, fn. 1, italics added; see also *McKee v. National Union Fire Ins. Co., supra*, 15 Cal.App.4th at p. 289 ["[A]n action under section 11580, subdivision (b)(2), is not an enforcement action against the judgment debtor. It is a separate action against an insurance company, subject to different defenses . . . ."].)

Thus, in order to determine if the bankruptcy stay in the Savoys' bankruptcy action tolled the time in which Vallejo had to file the action against Farmers, we need to ask if, in bringing the action, Vallejo was seeking to (1) enforce "a judgment obtained before the commencement of the" bankruptcy proceeding "*against property of the estate*," (2) to "obtain possession of *property of the estate* or of *property from the estate*,"

21

or (3) "to exercise control over *property of the estate*." (11 U.S.C. § 362(a)(2)-(3), italics added.) We conclude he was not seeking to do any of those three things, and the statute of limitations was not tolled.

"While the rights held by a debtor under insurance policies are property of the estate, whether the funds paid by the Insurers on account of the insurance policies are property of the estate is an entirely different question. A split of authority has developed regarding whether proceeds payable from such insurance are property of the estate." (*Landry v. Exxon Pipeline Co.* (Bankr. M.D. La. 2001) 260 B.R. 769, 785 (*Landry*).) The analysis employed by the United States District Court for Middle District of Louisiana in *Landry* is on point and is, to us, persuasive.

In *Landry*, *supra*, 260 B.R. at page 773, various plaintiffs had brought an action in Louisiana state court against the National Energy Group, Inc. (NEG) and other defendants alleging damages under Louisiana law. After plaintiffs filed their action, an involuntary Chapter 11 bankruptcy proceeding was commenced against NEG, and the plaintiffs had NEG dismissed from the state court action. (*Id.* at p. 774.) The plaintiffs then successfully moved to add, as defendants, NEG's insurers under a Louisiana statute allowing for direct action against insurers, and sought "to recover against certain comprehensive general liability . . . insurance policies issued by the Insurers to NEG." (*Ibid.*) Louisiana's direct action statute provides that, "[n]o policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his survivors, . . . or heirs against the insurer." (La. Rev. Stat. Ann. § 22:1269.)

The defendants to the NEG state court action removed the action to the United States District Court for the Middle District of Louisiana under the theory that the district court had jurisdiction under statutes conferring federal jurisdiction in bankruptcy actions and in actions related to bankruptcy actions. (*Landry*, *supra*, 260 B.R. at pp. 774, 775.) Plaintiffs, in turn, filed a motion to remand on equitable grounds as permitted by title 28 United States Code section 1452(b) or to abstain under title 28 United States Code section 1334(c). (*Landry*, at pp. 774-775.) In light of the fact that the matter potentially involved questions regarding bankruptcy court jurisdiction, the district court referred the matter to the United States Bankruptcy Court for the Middle District of Louisiana for resolution. (*Id.* at p. 775.) The bankruptcy court concluded that while the federal courts would not have exclusive jurisdiction over the action, removal jurisdiction under title 28 United States Code section 1452(a) and title 28 United States Code section 1334(b) would be permissible, because it was an action related to the bankruptcy proceedings. (*Landry*, *supra*, 260 B.R. at pp. 780-781.) However, the court observed, though the federal court could "take cognizance of the action," the action also could "have proceeded with equal dignity in the state court." (*Id.* at p. 781.)

In order to decide whether it ought to remand the case to the Louisiana state court on equitable grounds as contemplated title 28 United States Code section 1452(b), the bankruptcy court conducted an exhaustive examination of the split in authority regarding whether insurance proceeds due to third parties under liability insurance policies, like proceeds collectible under Insurance Code section 11580, are property of a bankruptcy estate. (*Landry*, *supra*, 260 B.R. at pp. 783-794.) Ultimately, the court concluded, "[u]nder [Louisiana's] state law, the debtor has no interests in the funds used by an insurance company to pay its own obligations which are separate and independent of the obligation owed by the debtor to pay that same debt. Therefore, the proceeds of liability insurance payable to non-debtor parties are not property of the debtor's estate under 11 U.S.C. § 541, or any other provision of the Code." (*Id.* at p. 801, fn. omitted.)

23

In carrying out its analysis, the bankruptcy court acknowledged that property of the bankruptcy estate is broadly defined, but not without limits: "[b]y choosing the phrase 'all legal or equitable interests of the debtor in property,' " to define the property of the bankruptcy estate, "Congress intended to include a broad range of property within the estate. In essence, all economic rights the debtor holds at the commencement of the bankruptcy become property of the estate under 11 U.S.C. § 541. 'Property of the estate,' however, is not limitless. The term is measured by the interests held by the debtor as of, or up to, the commencement of the case, unless otherwise provided within the statute. As stated by the Fifth Circuit [in *In re Louisiana World Exposition, Inc.* (5th Cir. 1987) 832 F.2d 1391, 1399], 'the estate's legal and equitable interests in property rise no higher tha[n] those of the debtor.' The estate includes only property to which the debtor would have a right if the debtor were solvent." (*Landry*, *supra*, 260 B.R. at pp. 783-784, fns. omitted.)

In considering a standard for determining if insurance proceeds under a policy are property of an estate, the *Landry* court favorably quoted *In re Edgeworth* (5th Cir. 1993) 993 F.2d 51, 55-56, for the rule that, " '[t]he overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, **when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate**.' " (*Landry*, *supra*, 260 B.R. at p. 786, boldface & underscoring added by *Landry*.)

The bankruptcy court then observed that in the liability insurance context, "the debtor has no cognizable claim to the proceeds paid by an insurer on account of a covered claim." (*Landry*, *supra*, 260 B.R. at p. 786.) The court also observed that the payment of proceeds under a liability policy could not be made available for distribution to the

24

creditors other than those with claims under the policies. (*Ibid.*) The proceeds that would be paid are "a component of the asset structure of the insurance company," and the claim to them is an obligation of the insurance company. (*Id.* at p. 787.) "When a covered claim arises, the injured debtor may have an interest, albeit a self-serving interest, in having a third party (the insurance company) pay for its wrongdoing, but this is not a legal or equitable interest in the property used to pay the claim." (*Ibid.*, boldface & underscoring omitted.) And when liability insurance is used to pay an obligation, "the debtor's estate will not be used to pay covered claims unless and until all coverage is exhausted." (*Id.* at p. 789.) Additionally, while the estate may be enriched by reducing the estate's liabilities when equitable and legal title to proceeds belongs to a third party, the estate does not actually increase. (*Ibid.*) "Property, however, does not become property of the estate merely because such property has the effect of reducing the estate's liability, or because of some other beneficial effect such property has on the estate. The estate must have a legal or equitable interest in the property which benefits the estate." (*Id.* at p. 790, boldface & underscoring omitted.)

Here, by the time the Savoys filed for bankruptcy, the liability insurance proceeds at issue would have been payable from Fire to Vallejo under an independent cause of action against Fire under Insurance Code section 11580. Fire would not have owed any funds to the Savoys. Having secured the Savoy judgment before the Savoys filed for bankruptcy, the right to bring a cause of action to collect funds from Fire pursuant to Insurance Code section 11580 belonged to Vallejo as the Savoys' judgment creditor, and Vallejo did not need to take any further actions against the Savoys to exercise that right. What is more, under the persuasive reasoning outlined in *Landry*, the proceeds Vallejo would have been paid under the policy were not an asset of the bankruptcy estate—they were due to Vallejo and the Savoys had no claim to them. Consequently, the bankruptcy stay did not apply to Vallejo's action to collect those proceeds from Fire, and it did not

25

toll the statute of limitations applicable to Vallejo's Insurance Code section 11580 action against Fire.

### 3. Vallejo's Arguments

Vallejo argues that in entering an order to lift the stay in the Savoys' bankruptcy proceeding on February 24, 2014, the Bankruptcy Court made a determination that relief from the stay in that action was needed before Vallejo could pursue this action, and we are bound by that determination. We disagree with Vallejo's interpretation of the Bankruptcy Court's order.

In the order, the Bankruptcy Court stated it was modifying the stay "to Name Debtors Nominally to Pursue Insurance Policy . . . ." Essentially, the Bankruptcy Court entered an order that would have allowed Vallejo to name the Savoys as defendants to an action if he needed to name them to collect proceeds under their insurance policy. The order does not make an explicit determination that either (1) the Savoys had to be named; or (2) that proceeds available under the policy could not be sought from Fire without lifting the stay.

Vallejo argues that "[i]f there [was] no interest [in] the bankruptcy" at issue in this action, "the Bankruptcy Court would have denied the request to reopen [the] bankruptcy as moot, as there would be no automatic stay restricting the lawsuit," but this assumes too much. The motion to lift the stay asked the Bankruptcy Court to lift a stay "*for the sole purpose* of permitting Vallejo to name Debtors nominally to allow Vallejo to proceed against Debtors' insurance policy." The supporting memorandum makes no mention of Insurance Code section 11580, and it states that Vallejo seeks to "name Debtors nominally to allow Vallejo to proceed against" Fire. Given the way the motion and its supporting memorandum were worded, it is equally likely that the bankruptcy judge, sitting in a state without a direct action statute, did not even consider the nature of insurance proceeds to be awarded and, instead, just created a clear path to bring an action

26

naming the Savoys if that would have been a prerequisite to bringing an action to collect the proceeds.

Both of the parties rely on *Jones v. Golden Eagle Ins. Corp.* (2011) 201 Cal.App.4th 139 (*Jones*) to support their arguments, with Vallejo characterizing it as the "single California reported decision directly addressing the interaction of the automatic stay with an action under Insurance Code § 11580[, subdivision ](b)(2)." Fire cites *Jones*, *supra*, 201 Cal.App.4th at page 148, for the proposition that the rights granted to a judgment creditor by Insurance Code section 11580, subdivision (b)(2), "exist 'without lifting the [bankruptcy] stay.' "

Vallejo disagrees with Fire's characterization of *Jones*. First, Vallejo argues that Fire's use of the *Jones* decision is a misquote—i.e., Vallejo argues the quoted language does not actually stand for the proposition that a judgment creditor's right to sue a bankruptcy debtor's insurer under Insurance Code section 11580, subdivision (b)(2), exists without the need to lift the bankruptcy stay. Next, Vallejo argues that the *Jones* decision holds that an Insurance Code section 11580 action may be brought by lifting the stay as to the insurer, but not the bankruptcy debtor. Vallejo is correct on the first point. Fire's use of the quoted language is misleading: the passage at issue does not state that, as a matter of law, a judgment creditor's right to bring an action against a liability insurer of a bankruptcy debtor exists without lifting the bankruptcy stay. But Vallejo's interpretation also misconstrues the subject passage of *Jones* and the central issues in *Jones*. A closer look at *Jones* and where the language at issue appears reveals that *Jones* does not dictate a result contrary to the one we reach here.

In *Jones*, *supra*, 201 Cal.App.4th at pages 142-143, a series of individuals (tort action plaintiffs) had sued Golden Eagle Insurance Corporation's (Golden Eagle) insured, Calsol, Inc. (Calsol), alleging they were harmed by exposure to one of Calsol's products. Golden Eagle was one of multiple companies that had provided general liability insurance to Calsol during the timeframe in which Calsol was alleged to have harmed the

27

tort action plaintiffs. (*Id.* at p. 143.) Calsol was in bankruptcy, but the bankruptcy court had granted the tort action plaintiffs relief from the automatic bankruptcy stay to allow them to pursue claims against Calsol "on the condition any judgment could be enforced only against Calsol's insurers, not against Calsol itself." (*Id.* at p. 142.)

Golden Eagle was placed in a conservatorship. (*Jones*, *supra*, 201 Cal.App.4th at p. 142.) As part of the conservatorship, the California Insurance Commissioner (Commissioner) established a procedure to handle claims against Golden Eagle, and sent notice of the procedure to counsel for the tort action plaintiffs. (*Id.* at p. 144.) When the tort action plaintiffs failed to file timely claims with the Commissioner, the Commissioner denied their claims. (*Ibid.*) Other companies that had provided Calsol general liability insurance during the timeframe at issue in the tort action filed claims in the Golden Eagle conservatorship proceeding seeking some of the costs of the defense and settlement of the tort action plaintiffs' claims, which the Commissioner rejected. (*Id.* at pp. 144-145.) The other insurers then filed an order to show cause in superior court, challenging the Commissioner's refusal, and the order to show cause was denied. (*Id.* at p. 145.) The insurers then appealed, and our First District Court of Appeal affirmed the trial court's decision. (*Id.* at pp. 142-143.) Thus, the central issue in *Jones* was whether Golden Eagle was required to share costs of the defense of the tort action plaintiffs' claims against Calsol. (*Id.* at p. 145.)

In resolving the central issue, the *Jones* court considered aspects of bankruptcy law to provide part of the context in which the issue arose. (*Jones*, *supra*, 201 Cal.App.4th at p. 147.) The court explained, "[f]ederal law provides that whenever a corporation or individual files for bankruptcy, all legal proceedings *against the bankrupt* are stayed, a provision referred to as the 'automatic stay.' (11 U.S.C. § 362(a); [citation].) . . . [U]pon a showing of 'cause,' the bankruptcy court has discretion to grant relief from the automatic stay. (11 U.S.C. § 362(d); [citation].) As noted, the bankruptcy court granted the [tort action] plaintiffs relief from the automatic stay to pursue Calsol's

28

insurers, but the plaintiffs continued to be barred from enforcing any judgment against Calsol itself." (*Jones,* at p. 147, italics added.) The court continued, "Calsol's bankruptcy did not release Golden Eagle and [other insurers] from their obligations under the insurance policies issued to Calsol. Insurance Code section 11580, subdivision (b)(1) expressly preserves the obligation of insurers to honor insurance policies issued to entities that become bankrupt. [Citation.] Further, *section 11580, subdivision (b)(2) permits a plaintiff who has obtained a judgment against an insured defendant to pursue a cause of action directly against the insurer for enforcement*." (*Jones,* at p. 147, italics added.) It is in this context that the court considered the other insurers argument that they should be able to seek costs of a defense in the tort action from Golden Eagle because, even though the tort action plaintiff's failure to file a claim against Golden Eagle may have extinguished Golden Eagle's obligation to those plaintiffs, the failure did not extinguish the tort action plaintiffs' claims against Calsol. (*Ibid.*)

In responding to this argument, the court used the language Fire and Vallejo focus on in their arguments. (*Jones*, *supra*, 201 Cal.App.4th at p. 148.) The court noted the other insurers' argument failed to take into account the situation created by Calsol's bankruptcy. (*Ibid*.) In the excerpt provided by Vallejo, the court stated, "[t]he bankruptcy court's order relieving the plaintiffs from the automatic stay restricted the enforcement of any judgment rendered in their lawsuits to Calsol's insurers. In effect, the bankruptcy court permitted the plaintiffs to pursue their remedy against the insurers under the rights granted by Insurance Code section 11580, subdivision (b)(2), <u>without lifting the stay</u> with respect to claims against Calsol (or, rather, its bankruptcy estate)." (*Jones,* at p. 148, underlined language quoted by Fire.) In a sentence not quoted by Vallejo, the court further explained, "[a]s a result, the plaintiffs' claims are only nominally against Calsol, being pleaded against Calsol only as a means to recover against the insurers. *The [tort action] plaintiffs' lawsuits do not, in fact, place any assets of Calsol at risk.* [¶] Because Calsol is not threatened with loss by the plaintiffs' lawsuits, the lawsuits did not

29

trigger Golden Eagle's duty to defend." (*Ibid.*, italics added.) In short, as a step in reaching the conclusion that Golden Eagle did not need to share in the costs of defending Calsol, the *Jones* court concluded the actions to determine Calsol's liability did not actually place any of Calsol's assets at risk, because any payments would come from insurers. (*Ibid.*)

The language quoted by the parties is not, as Fire suggests, a statement of law that a right to bring an Insurance Code section 11580 action against a bankruptcy debtor's liability insurer exists without lifting a bankruptcy stay. However, it also is not a judicial acknowledgment that a party previously injured by a bankruptcy debtor must always secure an order "lifting the stay as to the insurer" before that party can bring an Insurance Code section 11580 action against the bankruptcy debtor's insurer as Vallejo implies. Rather, it is an acknowledgment by the *Jones* court that under the facts of the *Jones* case, the tort action defendants had to obtain a stay in the bankruptcy action in order to bring an action against Calsol, which would serve as the statutory prerequisite for those defendants to then pursue their own rights against Calsol's insurers.

The reasoning employed by the *Jones* court supports our conclusion here. The right to bring an Insurance Code section 11580 direct action against a person's or entity's liability insurer is dependent on there being a judgment against that person or entity. In *Jones*, the bankruptcy stay prevented the tort action plaintiffs from bringing actions against Calsol, and, therefore, they needed to lift that stay to obtain judgments against Calsol. Once those judgments were obtained, those defendants could then collect from the insurers without "plac[ing] any assets of Calsol at risk." (*Jones*, *supra*, 201 Cal.App.4th at p. 148.)

In contrast, here, Vallejo did not need to lift a bankruptcy stay to obtain a judgment against the Savoys and secure his rights to bring an action against Fire under Insurance Code section 11580. This is so because by the time the Savoys filed for bankruptcy, Vallejo had already obtained a judgment against the Savoys. With that

30

judgment, he then had an independent right of direct action against Fire that did not "place any assets of [the Savoys] at risk." (See *Jones*, *supra*, 201 Cal.App.4th at p. 148.) And, thus, he did not need to obtain relief from the bankruptcy stay to bring an action against Fire in which he sought to collect insurance proceeds under the policy.

E.     Equitable Estoppel Did Not Toll the Statute of Limitations in Which to Bring the Insurance Code Section 11580 Cause of Action

In his responsive brief, Vallejo argues that even if the bankruptcy stay did not toll the statute of limitations for him to bring his Insurance Code section 11580 cause of action, Fire should be estopped from raising a statute of limitations defense based on its conduct while considering Vallejo's claim—i.e., based on its representations between July 18, 2013, and February 19, 2014, when the cause of action was already being equitably tolled as Fire considered Vallejo's claim for payment. Vallejo's argument in his responsive brief is that Fire told Vallejo's counsel that Vallejo could not claim benefits from Fire until Vallejo obtained relief from the bankruptcy stay, and this "affirmative statement that the automatic stay applied and precluded suit against Fire reasonably led Vallejo to believe that the statute of limitations was tolled based upon the automatic stay." Vallejo additionally notes that Fire not only told Vallejo the stay applied, it also refused to accept or deny the claim until relief from the stay was obtained. In reply to this argument, Fire argues equitable estoppel did not apply in this instance, primarily because (1) the applicability of the stay in the Savoys' bankruptcy proceedings to this action was a question of law not fact, and estoppel will not apply unless insurance companies misrepresent or fail to disclose material facts; (2) an insurance adjusters opinion's about questions of law are irrelevant; and (3) the law particularly disfavors estoppels when the party raising an estoppel was represented by counsel.

We directed the parties to submit supplemental briefing regarding a second possible basis equitable estoppel might have applied to toll the statute of limitations.

31

Specifically, we asked the parties to submit supplemental briefs on the following questions: "(1) Setting aside all consideration of whether the statute of limitations to file the action was tolled by the Nevada bankruptcy proceedings of the Savoys, what is the potential estoppel effect of the September 20, 2013, letter written by Elizabeth Croft to Jeffrey Silvia in which she wrote: 'California laws and regulations require that we provide you with the four year limitation period upon which we may rely to deny a claim'?[; and ¶] (2) If the statute of limitations was not tolled by the bankruptcy proceeding, should this matter be returned to the trial court for consideration of the above question in appropriate proceedings?"

In its supplemental opening brief, Fire made various arguments as to why the September 20, 2013, letter had no estoppel effect, the most persuasive of which were that it would not be reasonable to assume the letter's representations applied to payments due under the policy's business liability provisions, and it would not be reasonable for Vallejo's counsel to rely on Fire's representations about a legal issue.

In his supplemental brief, Vallejo does not attempt to argue that the September 20, 2013, letter, standing alone, created an estoppel that would preclude Fire from arguing that statute of limitations ran on Vallejo's claims. Instead, Vallejo's primary estoppel argument in his supplemental brief is a reiteration of his position that Fire's representations regarding the impact of the bankruptcy stay created an equitable estoppel. To the extent he considers the impact of the September 2013 letter regarding the medical payment, he notes that when Fire made a payment under the medical payments policy in September 2013, it "made no mention of the claim for the judgment," then states that in the next communication regarding Vallejo's general claim, Fire was back to asserting it would not address the liability claim unless and until relief from the bankruptcy stay was obtained.

Having considered all these arguments and the record, we conclude estoppel principles did not toll the statute of limitations for Vallejo to file his action against Fire.

32

The following standards as recited in *May v. City of Milpitas* (2013) 217 Cal.App.4th 1307 (*May*) guide our analysis here:

" 'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel' " to effectuate a tolling of the statute of limitations in which to file an action: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.]' (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305.) The detrimental reliance must be reasonable. (See *Lantzy v. Centex Homes* [(2003)] 31 Cal.4th [363], 384; *Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1152-1153.) 'The defendant's statement or conduct must amount to a misrepresentation bearing on the necessity of bringing a timely suit . . . . [Citations.]' (*Lantzy v. Centex Homes*, *supra*, 31 Cal.4th at p. 384, fn. 18.) [¶] 'As [the California Supreme Court] long ago explained in *McKeen v. Naughton* (1891) 88 Cal. 462, 467, " 'in order to work an estoppel,' " a representation " 'must generally be a statement of fact. It can rarely happen that the statement of a proposition of law will conclude the party making it from denying its correctness, except when it is understood to mean nothing but a simple statement of fact.' [Citation.]" ' (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1315.) *'[I]n the absence of a confidential relationship . . . where the material facts are known to both parties and the pertinent provisions of law are equally accessible to them, a party's inaccurate statement of the law or failure to remind the other party about a statute of limitations cannot give rise to an estoppel.'* (*Jordan v. City of Sacramento* (2007) 148 Cal.App.4th 1487, 1496.)" (*May, supra*, 217 Cal.App.4th at p. 1338, italics added, original italics omitted.)

"Moreover, '[i]n general, the law "particularly" disfavors estoppels "where the party attempting to raise the estoppel is represented by an attorney at law." [Citation.]

33

For purposes of analyzing estoppel claims, attorneys are "charged with knowledge of the law in California." (*Tubbs v. Southern Cal. Rapid Transit Dist.* (1967) 67 Cal.2d 671, 679 [rejecting claim of estoppel to assert statute of limitations].)' (*Steinhart v. County of Los Angeles*, *supra*, 47 Cal.4th at p. 1316.)" (*May, supra*, 217 Cal.App.4th at p. 1339.)

With respect to the September 20, 2013, letter, we agree with Fire that it would not have been reasonable for Vallejo to treat this letter as tolling the statute of limitations to bring an action regarding his claim for benefits under the liability coverage beyond what was provided for under the law, and Vallejo has pointed to no evidence and proffered no argument that the letter suggested as much. The first sentence of the letter indicates it is in reference to "medical benefits" available to Vallejo under the policy, and the claim unit number used to identify in the heading of the letter ends is "-1-3." That same number had been used in prior communications from Fire in which Fire explained the scope of potential medical coverage under the policy and is different from the number used by both Silvia and Newton, which ended in "-1-2," in discussing a possible payment on the larger judgment liability. Second, the statement regarding the four-year statute of limitations says nothing about when the statute would have begun to run and what, if anything, might have tolled the statute. There is no evidence the letter could have reasonably led Vallejo to conclude he had more than the four years from the date the Savoy judgment became final to challenge Fire's denial of his claim for liability payments. Therefore, the letter had no estoppel effect on the statute of limitations.

As to Vallejo's argument that Fire ought to be estopped from arguing the statute of limitations was not stayed by the bankruptcy in light of Fire's representations about the bankruptcy during the negotiations phase, we find it significant that the question of the impact of the stay was a legal one and Vallejo was represented by California counsel and consulted with bankruptcy counsel while Fire was considering his claim. Simply put, Vallejo was in as good a position as Fire during this time to figure out the legal ramifications of the Savoys' bankruptcy stay. Fire should not be estopped from arguing

34

the statute of limitations was not stayed by the bankruptcy because it took legal positions that Vallejo's counsel should have been equipped to question and challenge.

II

*Breach of Contract Cause of Action*

In its opening brief, Fire states that Vallejo's breach of contract claim is really a redundant pleading of his Insurance Code section 11580 claim, and that, therefore, the same statute of limitations requirements apply to that claim. While Vallejo does make a case for why a different statute of limitations may have applied to his bad faith claim, he does not make a similar effort to differentiate the breach of contract claim from the Insurance Code section 11580 claim.

Decisions describing the nature of a judgment creditor's rights under Insurance Code section 11580, subdivision (b), tend to support the conclusion that a judgment creditor's effort to collect funds due under a debtor's liability policy through a breach of contract action against the insurer is really just a different way to state a cause of action under Insurance Code section 11580. (See *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.* (1958) 160 Cal.App.2d 290, 298 [Ins. Code, § 11580, subd. (b) "is a part of every policy and creates a contractual relation which inures to the benefit of any and every person who might be negligently injured by the insured as completely as if such injured person had been specifically named in the policy"]; see also *Murphy v. Allstate Ins. Co., supra*, 17 Cal.3d at pp. 942-943 [Ins. Code, § 11580, subd. (b)(2) makes the judgment creditor a third party beneficiary of the insurance contract between the insurer and insured, and "[a] third party beneficiary may enforce a contract expressly made for his benefit"]; *Escobedo v. Travelers Ins. Co.* (1961) 197 Cal.App.2d 118, 127; *Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958, 998.) As such, our conclusions here regarding the statute of limitations as applied to Vallejo's Insurance

35

Code section 11580 claim also apply to his breach of contract claim. By the time he filed this action, the cause of action was time-barred.

## III

### *Timeliness of Bad Faith Cause of Action*

In the above sections we concluded that by the time Vallejo contacted Fire, the statute of limitations for him to file an Insurance Code section 11580 action—or breach of contract action—with respect to the De La Garza judgment had already passed. With respect to the statute of limitations for those actions on the Savoy judgment, 11 days remained until he needed to file a lawsuit. The statute of limitations was then tolled until Fire denied his claim on February 19, 2014, giving him until March 3, 2014, to file his Insurance Code section 11580 and breach of contract causes of action. As a result, when Vallejo filed this action on August 26, 2014, his Insurance Code section 11580 and breach of contract causes of action were time-barred.

This leaves us to consider whether Vallejo's cause of action alleging bad faith and the judgment on that cause of action can stand. We conclude that they can. Fire has not raised a persuasive argument that either (1) the action was time-barred, or (2) its denial of payments on the Savoy judgment was reasonable.

"The covenant of good faith and fair dealing is implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1147.) The covenant " 'imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, [and] also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.' (*Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417.)" (*Hand v. Farmers Ins. Exchange*, *supra*, 23 Cal.App.4th at p. 1854.) When a liability policy contains, " 'the usual promise to pay "on behalf of the insured . . . all sums which the

insured shall become legally obligated to pay as damages because of bodily injury or property damage. . . .” ’ (*Zahn v. Canadian Indem. Co.* (1976) 57 Cal.App.3d 509, 511.) There can be no doubt that, pursuant to this express policy undertaking, the implied covenant of good faith and fair dealing imposes a duty not to withhold in bad faith payment of damages which the insured has become obligated by judgment to pay.” (*Hand v. Farmers Ins. Exchange*, at p. 1857.) When bad faith is alleged in the withholding of a payment by the liability insurer, the judgment creditor can bring a cause of action for bad faith nonpayment of a finally adjudicated claim. (See *id.* at p. 1860.)

“[T]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause. (See also *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 184 Cal.App.3d 1428, 1433 [no award for bad faith can be made ‘without first establishing that coverage exists’]; *Kopczynski v. Prudential Ins. Co.* (1985) 164 Cal.App.3d 846, 849.)” (*Love v. Fire Ins. Exchange*, *supra*, 221 Cal.App.3d at p. 1151, fn. omitted.)

In its opening brief, Fire argues that because Vallejo’s suit was barred by the statute of limitations, Fire did not owe Vallejo benefits under the policy, and there could be no bad faith by Fire in denying the claim. Fire further argues that even if this court were to conclude the statute of limitations was tolled during the Savoys’ bankruptcy proceeding, Fire’s denial still would not have been in bad faith because it would have been reasonable for Fire to believe the bankruptcy stay did not apply. Notably absent from this argument is any explanation as to why Fire did not owe benefits under the policy at the time it denied the claim when, regardless of the impact of the bankruptcy stay, the statute of limitations had not run as to the Savoy judgment at the time Vallejo submitted his claim, and that statute of limitations was tolled until Fire issued its denial. That is, Fire appears to be asking this court to believe that even if there was no good reason to deny Vallejo’s request for a payment on the day he made his claim, we should

37

find Fire did not act in bad faith because they would have had legal cause to deny the claim if he had submitted it 11 days later.

In response, Vallejo argues that even if this court were to find the statute of limitations bars his Insurance Code section 11580 cause of action, the statute of limitations applicable to his bad faith cause of action did not begin to run until Fire allegedly denied his claim without cause, i.e., on February 19, 2014. Vallejo cites Code of Civil Procedure section 312 and *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397, for the proposition that a statute of limitations does not commence until the cause of action has accrued. Then, citing *Frazier v. Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90, 103-104, Vallejo argues that his bad faith cause of action did not accrue until Fire denied his claim.

In *Frazier*, *supra*, 169 Cal.App.3d at pages 95 and 97, a life insurance provider paid the wife of a decedent a basic death benefit, and later it denied her an accidental death double indemnity payment, stating it had concluded the decedent's death had been the " 'result of self-destruction.' " On a motion to dismiss, the trial court dismissed the breach of contract claim as time-barred by the limitations period contained in the policy. (*Id.* at p. 98.) However, the trial court allowed the plaintiff to proceed with her breach of covenant of good faith and fair dealing claim on the basis that it was governed by the four-year limitation contained in Code of Civil Procedure section 337, former subdivision (1), now subdivision (a), that applied to actions on written contracts. (*Frazier,* at p. 98.) On appeal, the Second District Court of Appeal agreed that the plaintiff's "[a]ction [did] not commence until [the insurer] denie[d] her claim on the ground of suicide. Prior to such time [plaintiff] ha[d] a right (so far as the policy limitation is concerned) to sit back and wait until denial of claim before urging bad faith. *Because it is not until [the insurer] actually denies the claim* on the ground of suicide that [plaintiff] can actually ascertain whether or not [the insurer] has acted in bad faith. *So long as [the insurer] continues to tell [plaintiff] they are trying to uncover new evidence, they have not committed an*

*ultimate act of bad faith*, and [plaintiff] has a right to rely upon their assurances." (*Id.* at pp. 103-104, italics added.) The court also found that plaintiff was entitled to a four-year statute of limitations on the bad faith claim. (*Id.* at p. 102.)

In its reply, Fire does not directly address Vallejo's argument that the statute of limitations on the bad faith cause of action did not begin to run until Fire denied his claim, and Fire otherwise makes no argument that the bad faith cause of action was itself time-barred. Instead, Fire again argues that in order for Fire to have acted in bad faith in denying Vallejo's claim, there needed to be an underlying contract obligation—or Insurance Code section 11580 obligation—from which the duty of good faith would flow. Then Fire makes more explicit its position that, regardless of Fire's actual reasons for denying coverage on February 19, 2014, it "had an objectively reasonable basis to deny coverage eleven days later when the statute of limitations elapsed," suggesting the passage of time can convert what is a bad faith decision into a good faith decision after the fact. This argument is not persuasive. Fire could not escape paying Vallejo's claim due to the passage of the applicable statute of limitations at the time he submitted his claim: Vallejo still had 11 days left to submit it. And those 11 days remained every day Fire spent considering his claim. Had Fire waited another month to decide the claim, it still could not have denied the claim on the basis that it was time-barred.

Based on the record and the arguments made, we find that Vallejo's bad faith cause of action was not time-barred when Fire denied it, Fire has failed to raise a convincing argument that it could have reasonably believed the claim was time-barred when Fire denied it, and Fire has not persuasively countered Vallejo's argument that the statute of limitations on the bad faith claim began to run the day Fire denied his claim. On this basis, we find there was no error in allowing the bad faith cause of action to proceed.

## IV

### *Calculation of Contract Damages*

In its opening brief, Fire argues the trial court miscalculated the "underlying-judgment-owed contract damages" Fire needed to pay Vallejo to compensate him for the amount Fire owed him under the policy when Fire denied the claim. Fire first observes that when the trial court calculated how much Fire owed Vallejo under the policy by the time judgment was entered in this action, it used the $249,405.96 figure from the May 30, 2017, renewed judgment in the underlying action as a starting point, and it added to that figure prejudgment interest at a rate of 10 percent per year from the date of renewal to the day of the hearing to calculate damages in this action, December 18, 2019. Fire then notes that the 2017 renewed judgment calculated the total amount due on the underlying lawsuit as of the date of renewal by adding interest to the De La Garza judgment from the date the De La Garza judgment was entered. Fire then correctly states that Vallejo's ability to collect on the De La Garza judgment with an Insurance Code section 11580 claim or breach-of-contract cause of action expired in 2011, before the Savoys' bankruptcy action—and before any other of the myriad possible tolling events we consider above occurred.

Fire then argues that if Fire owed Vallejo funds at the time it denied his claim, those funds were owed to cover what the Savoys and not De La Garza owed in the underlying action, and, pursuant to the 2017 judgment renewal, that figure had reached only $229,517.28 by May 2017, because the Savoy judgment was entered later than the De La Garza judgment. Fire argues the $229,517.28 figure should have been used as the baseline for calculating damages based on the nonpayment of funds owing under the policy, and that, using that base figure, the total interest due as of December 18, 2019, was $58,605.46, making the total amount due to cover Fire's obligation to pay the Savoy judgment $288,122.74, not $313,089.52.

40

In response to Fire's argument regarding the amount owing under the policy, Vallejo does not quibble with Fire's calculations and the basis for those calculations. Instead, Vallejo argues Fire waived this argument by failing to raise it below.

In reply, Fire claims that it preserved its ability to bring this argument, unconvincingly pointing to two arguments it made below that *none* of the post-judgment interest added in the 2017 renewal ought to have been included to calculate prejudgment interest in this action. While we disagree with Fire's position that it made an analogous argument below, "[a] legal argument may be raised for the first time . . . on appeal only 'so long as the new theory presents a question of law to be applied to undisputed facts in the record.' (*Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15; [citation].)" (*Nippon Credit Bank v. 1333 North Cal. Boulevard* (2001) 86 Cal.App.4th 486, 500.) Here, Fire is essentially asking us to resolve a legal issue: despite the fact that an action against Fire for failure to pay Vallejo under the De La Garza judgment was time-barred when Vallejo filed his claim with Fire, could the trial court award Vallejo interest owing on that judgment alone as if Fire had been legally required to pay on that judgment? We agree with Fire that the trial court had no legal basis to use the post-judgment interest awarded on the De La Garza judgment to calculate damages in this action, because Fire did not owe a payment on the De La Garza judgment. We direct the trial court to rely on amounts due under the Savoy judgment when recalculating damages on remand.

V

*Cross Appeal: Collectability of Costs Under <u>Brandt</u>*

In a cross-appeal, Vallejo argues that the trial court incorrectly found that costs are not collectible under *Brandt, supra*, 37 Cal.3d 813, and as a result the trial court improperly failed to award him costs incurred in obtaining benefits owed to him under the policy. Fire counters that *Brandt* does not permit trial courts to award anything other

41

than attorneys' fees. Fire also argues that if the trial court could have awarded costs under *Brandt*, Vallejo has failed to properly identify which costs would be collectible under the *Brandt* standard. Fire argues that because Vallejo failed to demonstrate, with evidence, which costs were incurred to obtain contract damages and which were incurred to obtain tort damages, Vallejo was not prejudiced by the trial court's determination and, thus, cannot show he was prejudiced by the trial court's ruling.

We agree with Vallejo's interpretation of *Brandt* and its progeny and find the trial court ought to have awarded Vallejo costs incurred to obtain the policy benefits. Though the trial court may have had discretion to review the evidence and calculate the distribution of amounts owed under *Brandt* (see *Track Mortgage Group v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 868 ["We must affirm the award in the absence of a showing of a clear abuse of discretion"]), the question presented here is whether the trial court correctly interpreted the law when it decided it could not also consider the evidence and make an appropriate award of costs. "Questions of law are reviewed de novo." (*American Contractors Indemnity Co. v. Hernandez* (2022) 73 Cal.App.5th 845, 848.)

"California adheres to the American rule, 'which provides that each party to a lawsuit must ordinarily pay his own attorney fees.' (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.)" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 806; see also Code Civ. Proc., § 1021 ["Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties"].) In *Brandt*, our Supreme Court "established a notable exception to this rule for insurance bad faith cases. [The Court] explained that if an insurer fails to act fairly and in good faith when discharging its responsibilities concerning an insurance contract, such breach may result in tort liability for proximately caused damages. Those damages can include the insured's cost to hire an attorney to vindicate the insured's legal rights under the insurance policy." (*Cassim*, at p. 806.)

In finding *Brandt* does not extend to allow for the recovery of costs, the trial court observed that *Brandt* only talks about the collection of fees. This is a fair observation: *Brandt* does not articulate a rule which explicitly applies to costs. However, the reasoning employed in *Brandt* and the Court's application of it in a subsequent decision both suggest that the underlying principles and policies that allowed for an award of fees should also extend to costs if and when a party has the foresight to seek them.

In *Brandt*, the Court reasoned, " 'It is well settled that if an insurer, in discharging its contractual responsibilities, "fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 574, original italics.) When such a breach occurs, the insurer is "liable for any damages which are the proximate result of that breach." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 925.)' (*Austero*[ *v. Washington National Ins. Co.* (1982) 132 Cal.App.3d 408,] 419-420 [dis. opn. of Morris, P. J.].) [¶] When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss -- damages -- proximately caused by the tort. (*Mustachio v. Ohio Farmers Ins. Co.*[ (1975)] 44 Cal.App.3d [358,] 363.) These fees must be distinguished from recovery of attorney's fees qua attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action. [¶] 'When a pedestrian is struck by a car, he goes to a physician for treatment of his injuries, and the motorist, if liable in tort, must pay the pedestrian's medical fees. Similarly, in the present case, an insurance company's refusal to pay benefits has required the insured to seek the services of an attorney to obtain those benefits, and the insurer, because its conduct was

tortious, should pay the insured's legal fees.' (*Austero, supra,* at p. 421.)" (*Brandt, supra*, 37 Cal.3d at p. 817.)

The Court agreed with and adopted much of the dissenting opinion in *Austero v. Washington National Ins. Co., supra,* 132 Cal.App.3d 408, quoting it to explain that " 'when the insurer's conduct is unreasonable, a plaintiff is allowed to recover *for all detriment proximately resulting from the insurer's bad faith*, which detriment *Mustachio* has correctly held includes those attorney's fees that were incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct.' (*Austero*, *supra*, at p. 422.) The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Brandt*, *supra*, 37 Cal.3d at p. 819, italics added, fn omitted.)

In justifying awards of attorney fees as tort damages in insurance bad faith actions, the *Brandt* court also cited *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59 to support its observation that in malicious prosecution cases, damages "may include attorney's fees incurred to obtain . . . dismissal of the unjustified charges." (*Brandt, supra*, 37 Cal.3d at p. 818.) Notably, in *Bertero*, *supra*, 13 Cal.3d at page 59, the court stated that "the measure of compensatory damages for the malicious prosecution of a civil action includes attorney fees *and court costs* for defending the prior action." (Italics added.)

In short, in considering the question of whether attorney fees ought to be collectible, the court found they should be to the extent they were part of what might be considered " ' "*any* damages which are the proximate result of that breach," ' " or, " 'for *all* detriment proximately resulting from the insurer's bad faith.' " (*Brandt*, *supra*, 37 Cal.3d at p. 817; *id.* at p. 819, italics added.) Because some costs incurred in litigation

44

are also arguably part of *any* or *all* detriment an insurance beneficiary suffers when an insurer wrongly denies benefits, *Brandt's* reasoning should extend to include them.

Moreover, shortly after the court decided *Brandt*, it issued a decision in which it did apply *Brandt* to allow for an award of litigation expenses other than just attorney fees. In *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, superseded by statute on other grounds as stated in *Lee v. Fidelity National Title Ins. Co.* (2010) 188 Cal.App.4th 583, 595-596, the court applied *Brandt's* holding to uphold an award that included various non-attorney fee litigation expenses: "[In *Brandt* we] stated that ' "when the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which detriment . . . includes those attorney's fees that were incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct." ' ([*Brandt, supra*, ]37 Cal.3d 813, 819.) The same reasoning supports inclusion of witness fees and other litigation expenses as an element of damage." (*White,* at p. 890.)

To the extent costs incurred by Vallejo were the proximate result of Fire's bad faith denial of Vallejo's claim, Vallejo ought to be able to collect them as part of his damages using formulas articulated in *Brandt* and its progeny.

With respect to Fire's argument Vallejo failed to meet evidentiary burdens that would allow the trial court to allocate costs under *Brandt*, the trial court ought to be given the opportunity to consider the strength of the evidence submitted, applying our interpretation of the rule articulated in *Brandt* before we consider what the evidence might or might not show. Accordingly, we remand to the trial court to consider which costs incurred by Vallejo in bringing this action were incurred to collect the amount Fire owed him under the policy at the time it denied his claim.

45

## DISPOSITION

We remand to the trial court to recalculate damages consistent with this opinion, that is, the policy benefits due and interest thereon should be calculated assuming the judgment Fire was obligated to pay was the Savoy judgment, and not the De La Garza judgment. Additionally, the trial court should award Vallejo costs incurred to collect the amount owing to him under the policy, consistent with the reasoning articulated in *Brandt* and its progeny for calculating an award of attorneys' fees. Each party is to pay its own costs on appeal. (Cal. Rules of Court, rule 8.278.)


_____

HULL, Acting P. J.


We concur:


_____

DUARTE, J.


_____

EARL, J.